Scott C. Rethorst v. Commissioner. Vehicle Research Corporation v. Commissioner.
Rethorst v. Comm'r
Docket Nos. 1875-68 and 1876-68. United States Tax Court
T.C. Memo 1972-222; 1972 Tax Ct. Memo LEXIS 35; 31 T.C.M. (CCH) 1101; T.C.M. (RIA) 72222; October 26, 1972
Earl C. Crouter, for the petitioners. Lloyd Nearing, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the Federal income taxes and additions to the taxes of petitioner Scott C. Rethorst for the years and in the amounts as follows: Addition to tax
under Sec. 6653(a)
Year
Deficiency
I.R.C. 1954
1961
$ 5,716.50
$ 285.83
1962
9,736.60
486.83
1963
8,623.20
431.16
1964
7,743.70
387.19
Respondent *36 determined deficiencies in the Federal income Respondent determined deficiencies in the Federal income taxes of petitioner Vehicle Research Corporation for the years and in the amounts as follows: Fiscal year ended
August 31
Deficiency
1961
$ 4,471.45
1962
14,118.31
1963
3,081.13
The issues for decision are: (1) Whether petitioner Scott C. Rethorst constructively received, in the calendar years 1961, 1962, 1963, and 1964, income in the amounts of $ 14,600, $ 22,600, $ 20,400, and $ 20,400, respectively, which amounts represent the difference in the $ 2,200 per month paid by Vehicle Research Corporation to Vehicle Research AG, a Swiss Corporation, and the $ 500 per month paid by the Swiss corporation to Scott C. Rethorst. (2) Whether petitioner Scott C. Rethorst received dividend income in the amount of $ 2,400 in the calendar years 1961, 1962, 1963, and 1964 because of having, without charge, the use of corporate property. (3) Whether any underpayment of tax by petitioner Scott C. Rethorst was due to negligence or intentional disregard of the rules and regulations. (4) If the amounts of $ 17,600, $ 26,400, and $ 26,400 paid to Vehicle Research AG *37 by petitioner Vehicle Research Corporation are not held to constitute payments to the full extent thereof to Scott C. Rethorst for services rendered by him to Vehicle Research Corporation, are these amounts properly deductible by Vehicle Research Corporation? (5) Whether petitioner Vehicle Research Corporation is entitled to deduct all of the expenses incurred in operating the facility located at 1661 Lombardy Road, Pasadena, California, or should some portion of these expenses be considered as in effect a dividend to Scott C. Rethorst because of his use of a portion of the premises without charge as a personal residence. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner Scott C. Rethorst (hereinafter referred to as Rethorst) resided in Pasadena, California at the time of the filing of the petition herein. He filed his individual Federal income tax returns for the calendar years 1961, 1962, 1963, and 1964 with the Los Angeles, California office of the Internal Revenue Service. Petitioner Vehicle Research Corporation (hereinafter referred to as VRC) was organized as a California corporation on September 4, 1957, with initial capital *38 of $ 1,000. All of the issued and outstanding shares of stock in VRC have at all times been owned by Rethorst who was and still is the president of VRC. Federal corporate income tax returns for the fiscal years ended August 31, 1961, August 31, 1962, August 31, 1963, and August 31, 1964 were filed on behalf of VRC with the Los Angeles, California office of the Internal Revenue Service. Originally, the principal business address of VRC was 587 Drexel Place, Pasadena, California, which was a house rented by Rethorst and also used by him as his personal residence. On June 16, 1959, Rethorst purchased a house at 1661 Lombardy Road, Pasadena, California (hereinafter referred to as the Lombardy property). In July 1103 1103 1961 Rethorst transferred the Lombardy property to VRC at his cost. During the years here in issue, the Lombardy property was used as VRC's principal place of business and as a personal residence by Rethorst and his minor son, John. The Lombardy property was a 20-room and basement stucco house located in a residential neighborhood of Pasadena. Rethorst and his son used two bedrooms and two bathrooms in the house as their living quarters and the existing facilities *39 for cooking and eating were used by them. The two rooms used by Rethorst and his son each had desks in them which were used by VRC employees during normal working hours. During some of the years here in issue as many as 30 to 40 employees of VRC worked at the Lombardy property. The large number of automobiles of VRC employees parked on the narrow residential streets around the Lombardy property caused a number of complaints from the owners of other property in the vicinity. In August 1961 VRC rented 2,000 square feet of space at 1456 East Walnut Street, Pasadena, which it used in addition to the space used at the Lombardy property. In August 1962, VRC discontinued its rental of the facility at 1456 East Walnut Street and rented a facility with 10,000 square feet of space at 161 East California Boulevard, Pasadena, which was used as a machine shio and facility for manufacturing prototype models. On October 16, 1961, Rethorst caused a Swiss corporation to be formed. The name of this corporation was Vehicle Research AG (hereinafter referred to as VERAG). The address and principal place of business of VERAG was Zug, Switzerland. VERAG was initially capitalized by the assignment *40 to it by Rethorst of a promissory note in the amount of $19,673.46. The maker of the note was VRC and the payee was Rethorst. The note was secured by a deed of trust on the Lombardy property. The $19,673.46 amounted to 84,559.88 Swiss francs. Fifty thousand (50,000) francs were credited to capital stock of VERAG and 34,559.88 francs were treated as an advance by Rethorst to VERAG. On November 6, 1961, a payment of $173.46 plus $379 in interest was made by VRC to VERAG on the promissory note thereby reducing the unpaid balance to $19,500. The public deed on the formation of VERAG reflects the following division of bearer shares in the corporation H. A. Huessy
498 shares
Roland Huber
1 share
Josiane Baldauf 1 share
500 shares
The VERAG board of directors consisted of one member, Hans Huessy, a Swiss attorney (hereinafter referred to as Huessy), during all of the years in issue. On September 21, 1961, Rethorst, his son John, and Riba Anstalt, a Liechtenstein company (hereinafter referred to as Riba), entered into an agreement which provided for a loan to Riba on behalf of Rethorst's son, John, which was not repayable until December 31, 1972, except in *41 case of the exercise of certain listed options. The agreement gave Riba an option to buy Rethorst's VRC stock at ten times the average earnings for the last 3 years, and if the option was not exercised by August 5, 1972, Rethorst was granted an option which expired December 31, 1972, to purchase all of the stock of VERAG. The agreement confirmed Rethorst's instructions to Huessy to act as incorporator and director of VERAG. It further provided that "Rethorst is authorized to give instructions to Dr. Huessy on the technical and administractive operation" of VERAG with the right of Riba to terminate this "right of Rethorst" by advising Rethorst and Huessy. VRC and VERAG entered into a "Service Agreement" having an effective date retroactive to January 1, 1961, whereby VRC agreed to pay VERAG $2,200 per month for the services of an engineering research team. Pursuant to the service agreement, VRC agreed to pay the rent for VERAG's laboratory and offices required under the agreement together with any out-of-pocket and incidental traveling expenses incurred by the engineering research team which were reasonable and necessary to the performance of work ordered by VRC. Under the service *42 agreement VRC paid in cash "fees" to VERAG in the following amounts for the years indicated: Year
Amount
1961
$ 9,800
1962
17,600
1963
26,400
1964
26,400 In addition VRC paid "fees" to VERAG during these years in the following amounts: Year
Amount of notes
1961
$ 13,000
1962
8,800
1963
None
1964
None 1104 On November 3, 1961, Rethorst informed Huessy that he approved of hiring an accountant by VERAG. Rethorst also directed VERAG to purchase the cheapest possible printed stationery for the submission of bills to VRC. On November 15, 1961, VRC and VERAG entered into a "Credit Agreement" under which agreement VERAG loaned to VRC the sum of $20,000 on the same date. The loan took the form of cash in the amount of $7,000 and a reduction in the amount due VERAG from VRC under the service agreement ($2,200 per month) by $13,000. The loan was evidenced by a promissory note secured by a second deed of trust on the Lombardy property. On November 17, 1961, VRC paid the balance due on the promissory note used to capitalize VERAG and the trust deed on the Lombardy property securing that note was discharged. On December 7, 1961, VRC *43 was awarded and entered into a research and development contract with the United States Department of Commerce, Maritime Administration for the design and development of a Ground Effect Ship. The estimated cost and fee under the contract which was to be performed over a 9-month period was $370,000. The contract period was subsequently extended to cover a period of over 3 years and the fee increased to over $1,000,000. During the peak periods of work on this contract with the Maritime Administration VRC employed approximately 30 to 40 people at the Lombardy property and approximately the same number at the machine shop at 161 East California Boulevard. Some of the staff were part-time employees. On January 2, 1962, VERAG transferred $15,000 to VRC in exchange for an unsecured promissory note. Under the date of December 15, 1961, Rethorst wrote Huessy referring to his letter to Huessy of December 12, 1961, asking for a further loan to VRC from VERAG of $15,000 and asking that the $15,000 be sent immediately. Rethorst told Huessy that VRC would receive no payment on the contract entered into on December 7, 1961, with the Maritime Administration until some time in January of 1972, *44 that the work on three Navy contracts had been completed and payment in full received, that VRC was attempting "to weather a severe contract and cash crisis" and needed "cash to pay our bills and meet our payroll until monthly payments under this new contract start flowing cash back into our till." In this letter Rethorst further stated: It is therefore necessary that we defer any plans for VERAG's hiring people and expanding and getting underway or anything else until VRC weathers this crisis. In February 1962 Rethorst instructed Huessy to have a copy of VERAG's monthly bank statements sent to him directly in California so that he could keep "abreast of the financial posture of VERAG, and take their requirements into account in our financial planning here." In a letter dated November 24, 1961, Huessy expressed concern over the possible lack of arm's-length dealing with respect to the $20,000 loaned to VRC by VERAG. Huessy's concern over the possible lack of an arm's-length dealing between VERAG and VRC and the lack of substance of VERAG was again stated in a letter dated January 11, 1962. [1] In a letter dated April 1105 25, 1962, Huessy expressed his concern over the tax *45 consequences which might result from the lack of substance of VERAG. *46 On May 1, 1962, VERAG transferred $8,800 to VRC. The funds represented the cancellation of the indebtedness for four installments due under the service agreement ($2,200 per month), evidenced by an unsecured promissory note. On May 18, 1962, Rethorst directed VERAG through Huessy to execute a credit subordination agreement to enable VRC to establish a line of credit of $75,000 with a Los Angeles bank. On May 23, 1962, VERAG entered into an agreement to subordinate its claims against VRC to those of Security First National Bank of Los Angeles. At the time VERAG held two promissory notes from VRC in the face amounts of $20,000 and $15,000, respectively. On the same date VERAG amended the $20,000 promissory note dated November 15, 1961, so as to defer monthly payments from Fevruary 1, 1962 to July 1, 1962, and the promissory note for $15,000 dated January 2, 1962, so as to defer monthly payments from January 2, 1962 to June 1, 1962. On January 3, 1963, the Small Business Administration (hereinafter referred to as SBA) informed VERAG in a letter to Huessy that it would loan $25,000 to VRC but that VERAG would have to subordinate its second deed of trust lien on the Lombardy property *47 to the lien of the SBA. By letter dated January 9, 1963, Huessy notified Rethorst that he would not execute the subordination agreement or standby agreement requested by the SBA unless instructed by Rethorst to do so. VERAG executed the subordination agreement giving the SBA a superior lien on the Lombardy property and also executed a standby agreement wherein it agreed that no principal or interest would be paid by VRC on its notes held by VERAG while the SBA loan was outstanding. In April 1965 VERAG deposited $30,000 with "Eleven Insured Savings and Loan Associations," Los Angeles, California. On July 1, 1965, the amount of $10,000 was withdrawn from the above account. Of that amount a check in the amount of $8,000 was issued to VRC and $2,000 was transferred to a Swiss bank account. In August 1965 a withdrawal in the amount of $6,000 was made and a check in that amount was issued to VRC. On July 15, 1966, VERAG withdrew $10,000 from Community Savings and Loan Association of Compton, California, in the form of a check made payable to VRC. The check was negotiated by VRC. On December 30, 1966, VERAG withdrew $4,000 from the Prudential Savings and Loan Association, San *48 Gabriel, California, in the form of a check made payable to the Swiss bank corporation for the account of VERAG. On May 2, 1966, Rethorst instructed Huessy to execute credit subordination agreements on behalf of VERAG in the amounts of $54,817 and $13,200. The subordination agreements with the Bank of America were executed by VERAG under date of April 29, 1966. Prior to 1961, VRC had paid compensation to Rethorst for consulting fees at an average monthly rate of $2,200 and deducted the payments on its Federal income tax returns. Beginning in 1961 Rethorst received no compensation in salary or fees from VRC. Commencing in January 1961 and continuing through the years in issue, Rethorst received a salary of $500 per month from VERAG. During all times relevant, Rethorst devoted his working time and services to the businesses of VRC and VERAG. Rethorst spent approximately one month in each of the years here in issue in Switzerland, some of which time was devoted to affairs of VRC. During the remainder of the year during each of the years here in issue Rethorst spent his working time primarily in work for VRC. VERAG paid out no amount as compensation for services during the years *49 here in issue except the $500 monthly payments to Rethorst and small amounts as directors and accounting fees. VERAG's income during the years here in issue consisted entirely of the $2,200 fee paid to it by VRC and small amounts of interest received. On August 25, 1960, Rethorst was ordered to pay child support in the amount of $200 per month on behalf of his minor daughter, Susan Rethorst, by the Superior Court of the State of California in and for the county of Los Angeles. On September 15, 1961, the same court ordered Rethorst to make child support payments on behalf of Lisa Suzanne Rethorst in the amount of $450 per month. The suit which was concluded by this order of September 15, 1961, was commenced on March 29, 1960. 1106 On December 22, 1961, the child support payments were modified to provide that Rethorst was obligated to pay child support in the amount of $325 per month on behalf of Susan Rethorst and $325 per month on behalf of Lisa Suzanne Rethorst except that in the event Rethorst's adjusted gross income did not exceed $500 per month, he was only obligated to pay $150 per month on behalf of each child. However, if Rethorst's adjusted gross income exceeded $500 *50 per month, he was obligated to pay $150 per month plus 30 percent of his adjusted gross income over $500 on behalf of each child, but not to exceed $325 per month per child. Each order contained a provision that if Rethorst was in default as to any payment for 30 days, payments at the rate of $325 per month from December 15, 1961, would immediately become due. Rethorst was required under each order to furnish to the lawyers representing the mothers of the two children copies of his Federal income tax returns. The orders provided that income as used in the order meant "adjusted gross income" for United States Federal income tax purposes except that the rental value of any housing furnished to Rethorst by his employer would not be considered as income for the purpose of the order. Rethorst's liability for child support for Lisa Suzanne Rethorst ceased on May 4, 1965. On his Federal income tax returns for each of the years 1961, 1962, 1963, and 1964, the only income reported by Rethorst was $6,000 which he reported as received from "Vehicle Research Inc." in the years 1962, 1963, and 1964, and income reported in 1961 as received from "Vehicle Research Corp." to the extent of $4,500 *51 and from "Vehicle Research, Inc." to the extent of $1,500. His income tax was computed from the tax tables in each year. VRC on its Federal income tax return for its fiscal year ended August 31, 1961, showed a salary of $1,200 as paid to Rethorst and on its returns for its fiscal years ended August 31, 1962, 1963, and 1964, showed no salary as paid to Rethorst. Included in the deductions claimed by VRC on its return for the year ended August 31, 1961, was $17,600 paid as fees to VERAG and in each of its fiscal years ended August 31, 1962, 1963, and 1964, VRC included in the deductions claimed on its returns the $26,400 paid as fees to VERAG. In its fiscal years ended August 31, 1962, 1963, and 1964, it deducted depreciation on and operating expenses of the Lombardy property. Respondent determined that these expenses exclusive of taxes and interest paid were $3,565.54, $3,228.73, and $3,478.72 for the fiscal years ended August 31, 1962, 1963, and 1964, respectively. Respondent in his notice deficeincy to Rethorst increased his income as reported in the following amounts: 1961
1962
1963
1964
(a) Dividend $ 14,600
$ 22,600
$ 20,400
$ 20,400
income or compensation
(b) Constructive 2,350
2,350
2,350
2,350
dividend
*52 The amounts of "dividend income or compensation" were stated in the notice of deficiency to be amounts "constructively received" in excess of the $6,00 reported by him. The amounts of "constructive dividend" in each year were stated in the deficiency notice to represent the $2,400 value of the use of corporate property of VRC without compensation less a $50 dividend exclusion. In his notice of deficiency to VRC respondent disallowed the amounts in each of the fiscal years ended August 31, 1961, 1962, and 1963 claimed by the corporation as deduction of fees paid to VERAG and in each of the fiscal years ended August 31, 1961, 1962, and 1963, and 1964 disallowed one-half of the expense deductions in excess of taxes and interest which he determined VRC had claimed on the Lombardy property. In explanation of the disallowance of each deduction disallowed for payments to VERAG, respondent stated in the notice of deficiency that it had not been established that any part of these payments constituted an ordinary and necessary business expense or was expended for the purposes indicated. In explanation of the disallowance of part of the expenses deducted in connection with the Lombardy property, *53 respondent gave a similar explanation in his notice of deficiency. Opinion The issues here are purely factual. Respondent's primary position is that the difference between the $2,200 per month paid by VRC, Rethorst's wholly-owned 1107 domestic corporation, to VERAG, a Swiss corporation, and the $500 per month received and reported by Rethorst as salary from VERAG represents additional income to Rethorst under section 61(a), I.R.C. 1954. [2] Respondent on brief recognizes that if he is sustained in his primary contention with respect to the additional compensation received by Rethorst, he should not be sustained in his disallowance of the deduction to VRC for fees paid to VERAG. Respondent does not contend that $2,200 per month is excessive compensation for the services rendered by Rethorst to VRC in each of the years here in issue. *54 Respondent takes the position that at least one-half of the operating expenses of the Lombardy property is not properly deductible by VRC because of Rethorst's personal use of the property and that Rethorst received a constructive dividend in each of the years 1961 through 1964 in the amount of $2,400 representing the fair market value of his personal use of the Lombardy property. Respondent contends that he is correct in determining that Rethorst is liable for the addition to tax for negligence under section 6653(a), for each of the years 1961 through 1964. Rethorst takes the position that he received no dividend income from VRC during the years in issue, that there is no deficiency in his Federal income taxes, and that there is no basis for the application of the addition to tax for negligence. Petitioner VRC contends that the amounts paid to VERAG under the service agreement were reasonable expenses for consulting fees for which the corporation is entitled to a deduction under section 162(a). Section 61(a) provides that all income from whatever source derived is includable in a taxpayer's gross income. This broad provision requires inclusion in a taxpayer's gross income of *55 all compensation for services and dividends. It is well established that compensation for services is an item of gross income which cannot be effectively assigned to escape the burden of taxation, Lucas v. Earl, 281 U.S. 111 (1930), and Helvering v. Horst, 311 U.S. 112 (1940). See also Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1958). As we stated in Paul W. Trousdale, 16 T.C. 1056, 1065 (1951), affirmed 219 F. held that a taxpayer may not avoid his tax 2d 563 (C.A. 9, 1955), "it has long been the simple expedient of drawing up legal papers and assigning that income to others." The Court of Appeals for the Ninth Circuit (219 F. 2d at 568) pointed out that not only will an assignment of income already earned by a taxpayer not be recognized for Federal income tax purposes, but that an assignment of "salary and fees to be earned" even though valid under State law, will not prevent such earnings from being taxable for Federal income tax purposes to the person who earned the income. Our initial question here, therefore, is whether VERAG as a corporate entity or Rethorst, as an individual earned the $2,200 per month *56 paid by VRC to VERAG. See Jerome J. Roubik, 53 T.C. 365, 379 (1969). [3] We conclude from all the evidence that the amounts paid by VRC to VERAG were not paid for services performed by VERAG, but rather for services performed by Rethorst who devoted most of his working time to the operation of VRC. Prior to 1961 Rethorst had been paid fees by VRC at an average monthly rate of $2,200. In October 1961 Rethorst caused VERAG to be formed and provided the only source of capital for its formation. [4] 1108 The creation of VERAG and the elaborate triangular arrangement involving VRC, *57 VERAG, and Rethorst did not result in anyone other than Rethorst earning the $2,200 compensation Rethorst had VRC pay to VERAG. Respondent suggests that the purpose of circumscribing the full import of the Court orders *58 resulting from litigation involving Rethorst's support of two minor daughters was the reason for this arrangement. The record clearly shows that the amount of child support to be paid by Rethorst under decrees of the California courts was dependent upon Rethorst's adjusted gross income. The record as a whole indicates that Rethorst sought to minimize his payments under the decrees by diverting his compensation income to VERAG. However, we do not base our holding on this fact. Regardless of his reason for having income which he earned paid to another, a taxpayer cannot in such a manner avoid Federal income tax on the income he has earned. It is well established that where a taxpayer has the option of receiving funds or directing the payment of the funds to another, the funds must be accounted for by him for income tax purposes. Helvering v. Gordon, 87 F. 2d 663 (C.A. 8, 1937); Lucas v. Earl, supra; and Helvering v. Horst, supra. supra. All through the years in issue Rethorst retained ultimate control and discretion over the amounts paid by VRC to VERAG as well as the amounts paid by VERAG to Rethorst. [5] The unilateral power of Rethorst to *59 order not only the extension of credit by VERAG to VRC but to subjugate any position VERAG might have as a creditor through the use of subordination agreements is demonstrative of that control. In addition, there is no evidence that VERAG exercised any control over the services performed by Rethorst, who was the only fullsalaried employee of that corporation. We therefore conclude that the $2,200 per month paid by VRC to VERAG was in fact compensation income to Rethorst. [6]
*60 The next issue is whether the corporation, VRC, is entitled to deduct in full depreciation and maintenance expenses with respect to the Lombardy property and if not the amount of such expenses it is entitled to deduct. VRC is required to show that expenses paid were legitimate business expenses and not merely a guise to deduct what are in fact personal expenses of a sole stockholder paid by the corporation. Challenge Manufacturing Co., 37 T.C. 650 (1962), and International Trading Co. v. Commissioner, 275 F. 2d 578 (C.A. 7, 1960), affirming a Memorandum Opinion of this Court. Where the property is used for both personal and business purposes, an allocation is necessary between the deductible and nondeductible portion of the expenses and depreciation. Clarence J. Sapp, 36 T.C. 852 (1961), affirmed per curiam 309 F. 2d 143 (C.A. 5, 1962). Such an allocation is required even where the personal use is relatively minor. Alabama-Georgia Syrup Co., 36 T.C. 747, 771, (1961), reversed on another issue sub nom. *61 Whitfield v. Commissioner, 311 F. 2d 640 (C.A. 5, 1962). In that case the only personal use by the corporate stockholder of property owned by the corporation was occasional personal use by the stockholder's sons. Nevertheless we disallowed a small percentage of the expenses and depreciation deducted by the corporation with respect to the property. The record herein reflects that the Lombardy property was a 20-room, two story, stucco house located in a residential neighborhood. Rethorst and his son, John, occupied two bedrooms and used two baths in addition to the existing eating facilities. The entire house including the eating facilities and the bedrooms used by Rethorst and his son, each of which contained desks occupied by VRC employees during normal working hours, was used by VRS in its business operations. The record shows that the Lombardy property was primarily devoted to the 1109 profit-making business purposes of VRC and that the personal use by Rethorst and his son was small in comparison to the business use of the property by VRC. On the basis of the record as a whole we conclude that VRC is entitled to deduct 90 percent of the expenses (other than taxes *62 and insurance determined by respondent to be deductible in full) and depreciation on the Lombardy property and that 10 percent of such amount instead of the 50 percent determined by respondent is not deductible because of being paid for the personal use of the property by Rethorst. As pointed out in International Artists, Ltd., 55 T.C. 94, 108 (1970), the amount of divvdend income to a stockholder resulting from his personal use of corporate real property is measured by the fair rental value of his use of the property. Respondent determined that $2,400 is includable in Rethorst's income in each of the years here in issue because of his personal use of the Lombardy property. The record indicates that respondent considered Rethorst and his son to have exclusive use of two bedrooms and two baths in the Lombardy property as well as primary use of the kitchen facilities. This is not the fact. During normal business hours the corporation had the use of all of the Lombardy property except for the areas occupied by the personal effects of Rethorst and his son. Except for a very small part of the property, Rethorst and his son had use of a portion of the property only when it *63 was not being used by the corporation. Considering the evidence as a whole we conclude that the fair rental value of Rethorst's personal use of the Lombardy property in each of the years here in issue was $600. Therefore, the amount of Rethorst's income for use of the Lombardy property in each year here in issue is $600 instead of the $2,400 determined by respondent. Respondent determined an addition to tax under section 6653(a) with respect to petitioner Scott C. Rethorst, on the basis that part of the underpayment of tax in each of the years in issue was "due to negligence or intentional disregard of rules and regulations." Respondent's determination of this addition to tax is presumptively correct and the burden of proof is on Rethorst. Estate of Ralph B. Campbell, 56 T.C. 1, 14 (1971). Rethorst has failed to produce evidence to rebut the presumption of correctness. The evidence that is in the record tends to indicate a disregard by Rethorst of the requirements of respondent's rules and regulations. We therefore sustain respondent's determination of the addition to tax under section 6653(a) as to Rethorst. Decisions will be entered under Rule 50. Footnotes
1. Huessy's letter, dated January 11, 1962, contained the following caveat: I feel, at this point, that in order to avoid misunderstanding, I have to make it clear that I have no intention whatsoever to unnecessarily and unreasonably complicate the cooperation between VRC and VERAG. As a matter of fact, I am committed, in my quality as fiduciary director, to carry out the instructions of the beneficial owners. But it is my duty to draw their attention to the particularities of Swiss law and also to certain Swiss standards in the field which we have to observe if we do not wish to incur risks. This is of course a basic condition for me to continue my functions as director. Now, under Swiss law, for any purposes of possible tax investigation, there is no doubt but that VRC and VERAG would be considered related companies subject to close examination of the arm's length standard of their dealings. On other other hand, if the plans of VERAG to engage in active research operations in Switzerland will finally materialize, I can assure you that nobody will, in the present boom, be ready to work for us unless the Company has a certain substance and offers sufficient security or else pays a premium for the risk. I already explained to Dr. Rethorst that we do not have the "hire-fire" system, but that employees are accustomed to an adequate protection in this country. I perfectly understand the reasonableness not to leave the funds of VERAG idle at the moment, and I am of course aware that the necessities of VRC come first, but I simply wish to draw your attention to the situation in Switzerland for the later operations' stage. I am positive that you feel the same way about this and that after the preliminary difficulties of a complicated starting period the cooperation is bound to work much smoother.↩
2. All references are to the Internal Revenue Code of 1954. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * * (7) Dividends; * * *↩
3. We note that the issue herein is not whether the $2,200 per month paid by VRC to VERAG was a capital contribution to VERAG for Rethorst's benefit or a bona fide loan, the issue involved in W. B. Rushing, 52 T.C. 888, 893 (1969), aff'd 441 F. 2d 593↩ (CA-5, 1971) cited by petitioners on brief. If the $2,200 per month was paid for services respondent recognizes that it is deductible by VRC as an ordinary and necessary business expense under sec. 162(a). Respondent's primary position is that Rethorst earned the $2,200 and merely arranged for its payment to VERAG.
4. We need not and do not pass on the substance of VERAG but note that the record does not reflect the presence of any meaningful business function on the part of VERAG. Rethorst testified that VERAG was formed to facilitate the enlistment of the services of Manfred Rauscher and George Ackeret, both of whom were employed by the Swiss government as professors of aerodynamics at the Swiss Institute of Technology. He further testified that while employed in that capacity Rauscher and Ackeret could not participate in a foreign corporation, and since their association with VRC was desired to favorably influence the award of the contract for the development of the Ground Effect Ship with the Maritime Administration, VERAG was created as a Swiss corporation. The record does not contain any other testimony or evidence of business purpose on the part of VERAG or that either Rauscher or Ackeret ever did any work for or received any compensation from either VERAG or VRC.↩
5. The precise ownership of VERAG is somwhat t obscure based on the record before us. However, the record is replete with evidence that ultimate control of VERAG was with Rethorst. ↩
6. Having concluded that amounts paid by VRC to VERAG were in fact compensation income to Rethorst, it becomes unnecessary to pass on respondent's alternative argument in this case that the amounts paid to VERAG by VRC did not constitute ordinary and necessary business expenses deductible under section 162(a).↩