ALBERT M. DAVIDSON and ELIZABETH J. DAVIDSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davidson v. Commissioner
Docket No. 10194-78.
United States Tax Court
T.C. Memo 1981-467; 1981 Tax Ct. Memo LEXIS 276; 42 T.C.M. (CCH) 903; T.C.M. (RIA) 81467; August 27, 1981. Marvin C. Gutter, Richard A. Josepher, and Martin J. Nash, for the petitioners. Chauncey W. Tuttle, Jr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1974 in the amount of $ 317,873.62. The only issue for decision is whether petitioners are entitled to report the gain on the disposition of stock of Aldason Corporation on the installment method. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Albert M. Davidson and Elizabeth J. Davidson, husband and wife, who resided in Miami Beach, Florida, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1974. During 1974 Albert M. Davidson (petitioner) owned 174 shares out of 200 outstanding shares of the stock of Aldason Corporation (corporation). The remaining *278 26 shares of stock of the corporation were owned by petitioner's minor sons, Shane and Daniel. Each of petitioner's sons owned 13 shares which had been acquired by gifts from petitioner as follows: Shares Given
Shares Given
Date of Gift
to Shane
to Daniel
December 10, 1971
2
2
February 7, 1972
2
2
February 7, 1972
5
5
February 14, 1973
2
2
January 2, 1974
2
2
In 1974 Shane was 4 years old and Daniel was 5 years old. Petitioner was 63 years old in 1974 and was in poor health. At a special meeting of the board of directors of the corporation held on October 15, 1973, a resolution was adopted proposing a plan of complete liquidation and dissolution of the corporation. On October 15, 1973, the shareholders of the corporation consented to the board of director's plan to liquidate the corporation. The corporation on October 17, 1973, entered into an option agreement with American Chain and Cable Co., Inc. (ACCO), whereby ACCO was granted the option to purchase certain real estate belonging to the corporation. On June 11, 1974, the corporation entered into a supplemental agreement with ACCO and the sale was consumated on June 15, 1974. On *279 February 6, 1974, the corporation entered into an agreement for the sale of real estate to David L. Lerman, Michael Lerman, and Gerald Lerman. In May or June 1974 the corporation sold a piece of property to Justin Barron for $ 5,000 down and a note secured by a mortgage for $ 55,000. Prior to October 10, 1974, the corporation had converted substantially all of its assets into cash, notes, or mortgages. A Form 966, "Corporate Dissolution or Liquidation," was filed on behalf of the corporation on October 15, 1973, with the Internal Revenue Service. Petitioner was concerned about the welfare of his young children because of his age and poor health. Petitioner had discussed this concern with his attorney and on September 19, 1974, he and his attorney discussed with William B. French, the individual who was then head of the trust department at the National Bank of South Bend, Indiana (bank), the possibility of opening a trust account in the bank for the benefit of petitioner's children. Petitioner's attorney had suggested to him that he could create an irrevocable inter vivos trust for the benefit of his children and have the trust purchase his stock in the corporation on an installment *280 basis. The attorney advised him that the trustee would then be the stockholder and could either revoke the resolution of dissolution of the corporation or proceed with the liquidation, investing the funds received upon liquidation and obtaining a profit for the trust from the difference between the return the trust would receive from the investment of its assets and the interest which would be paid to petitioner on the installment note for the purchase of his stock. The attorney advised petitioner that the creation of the trust and the sale of stock to the trust could be patterned so that the transaction would be identical to that in Rushing v. Commissioner, 52 T.C. 888 (1969), affd. 441 F.2d 593 (5th Cir. 1971). Petitioner and his attorney informed Mr. French that the establishment of the trust and sale of the stock to the trust was being planned to follow precisely the facts in the case of Rushing v. Commissioner, supra. Petitioner's attorney explained to petitioner and Mr. French that in order to have the facts comparable to those in the Rushing case, it would be necessary that the stock be sold to the trustee prior to *281 the distribution of the assets of the corporation in liquidation and that the trustee act independently in deciding whether or not a liquidation under section 337 [1] was in the best interest of the trust beneficiaries. The lawyer and Mr. French both understood and informed petitioner that under Indiana law the trustee would have the power to revoke the decision to liquidate the corporation after the stock was transferred to the trust. Mr. French looked into the facts involved in the Rushing case and also had other individuals in the trust department of the bank check these facts for him to determine if the transaction contemplated by petitioner could be carried out in the way petitioner suggested with an end result of an installment sale of petitioner's stock to the trust. On October 9, 1974, the corporation paid to each Shane and Daniel $ 75,000 as the first of two payments in complete redemption of the 13 shares of the corporate stock owned by each of petitioner's chilkdren. The $ 150,000 was turned over to petitioner's *282 younger brother to be held by his younger brother as custodian for the benefit of his children. On October 10, 1974, petitioner and the bank entered into an irrevocable trust agreement with petitioner as grantor and the bank as trustee which trust was entitled "Albert Davidson Irrevocable Inter Vivos Family Trust" (trust). The agreement provided for the trust to be divided into two parts, one part for each of petitioner's two children. In addition to the normal powers granted to trustees under Indiana law, the trust agreement granted the trustee broad powers including the power to retain or sell property, to invest or reinvest the assets of the trust, to borrow money, to lease real estate, to subdivide or partition real estate, to operate a business, to organize a corporation, to apportion receipts between income and corpus, to purchase any security or other property from the estate of the grantor or his spouse, and to make loans and advances to the estate of the grantor and the spouse of the grantor. The trust provided that on January 1, 1975, petitioner's brother, Dr. Morris Davidson, would serve as co-trustee with the bank. It provided that if the bank was unable or unwilling *283 to serve, a successor corporate trustee should be designated. Petitioner contributed $ 500 in cash to the trust when the trust agreement was executed. On October 10, 1974, petitioner and the bank as trustee of the trust entered into a "Purchase and Sale Agreement" which provided in part as follows: WHEREAS, the SELLER is the owner of eighty-seven (87%) percent of yhe outstanding capital stock of ALDASON CORPORATION, an Indiana corporation, hereinafter referred to as the "CORPORATION", and wishes to sell such stock to the PURCHASER, and the PURCHASER has agreed to purchase such stock on the terms and conditions hereinafter set forth; NOW, THEREFORE, in consideration of the sum of Ten ($ 10.00) Dollars and other good and valuable consideration, paid by the PURCHASER to the SELLER, the receipt of which is acknowledged, the parties agree as follows: FIRST
1.1 Sale of Stock. The SELLER agrees that on the Closing Date he shall sell, convey, assign, transfer and deliver to the PURCHASER, effective as of the Closing Date specified in Section 6.1 hereof, eighty-seven (87%) percent of the issued and outstanding capital stock of the CORPORATION consisting of One Hundred *284 Seventy-Four(174) shares of common stock, no par value, for the consideration hereinafter provided. 1.2 Purchase Price. The SELLER shall sell and the PURCHASER shall purchase the capital stock of the CORPORATION for the sum of ONE MILLION ($ 1,000,000) Dollars, subject to the adjustments of purchase price set forth in Section 1.3 hereof and payable in the manner set forth in Section 1.5 hereof. 1.3 Reductions in Purchase Price. There shall be deducted from the purchase price, referred to in Section 1.2 hereof, an amount equivalent to the total of the following items of the CORPORATION as of the Closing Date: (a) Accounts payable by the CORPORATION; (b) Taxes of the CORPORATION, determined on the basis that the CORPORATION ceased business on the Closing Date, including but not limited to, Federal and State income taxes of the CORPORATION, Federal income taxes on wages withheld at the source, Federal payroll taxes, State payroll taxes, State privilege tax and State sales tax. 1.4 Determination of Purchase Price. The purchase price, adjusted as provided in Section 1.3, shall be determined by the certified public accounting firm of LEO LANDIS, *285 C.P.A., Miami Beach, Florida; which shall prepare the necessary statements, computations and balance sheets, all to be made as of midnight of the Closing Date. Such determination of the adjusted purchase price shall be conclusive on the SELLER and the PURCHASER, when submitted in written form. Within Ninety (90) days from the Closing Date, such firm shall reconfirm its computations of the adjusted purchase price, and if it shall appear from such reconfirmation that the computations were inaccurately made, adjustment shall be promptly made between the parties, so that the PURCHASER shall be reimbursed for any overpayment made or shall pay the SELLER the amount of any underpayment. 1.5 Payment of Purchase Price. The adjusted purchase price shall be payable as follows: (a) Cash at Closing. At the Closing Date, by cashier's check the PURCHASER shall pay to the SELLER ONE HUNDRED FIFTY THOUSAND ($ 150,000) Dollars. (b) Balance of Purchase Price. The balance of the purchase price shall be paid as follows: On January 2, 1975
$ 200,000.00
On January 2, 1976
200,000.00
On January 2, 1977
65,000.00
On January 2, 1978
65,000.00
On January 2, 1979
65,000.00
On January 2, 1980
65,000.00
On January 2, 1981
65,000.00
On January 2, 1982
65,000.00
On January 2, 1983
60,000.00
*286 The foregoing annual installments shall be paid when due, together with interest from the Closing Date at the rate of Four (4%) Percent per annum, pursuant to the terms of the promissory note provided herein. The payment due on January 2, 1983, in the sum of SIXTY THOUSAND ($ 60,000) Dollars, as above provided for, shall be adjusted in accordance with the provisions contained in Sections 1.3 and 1.4 hereof. FIFTH
5.1 Documents at Closing. At the closing, the SELLER shall deliver to the PURCHASER the following: (a) The certificate, or certificates, representing eighty-seven (87%) percent of the issued and outstanding shares of capital stock of the CORPORATION, endorsed in blank with any necessary documentary transfer tax stamps affixed and with signatures guaranteed by a United States bank or trust company. (f) The written resignation of each officer and director of the CORPORATION effective as of the Closing Date, together with general releases to the CORPORATION effective as of the Closing Date, together with general releases to the CORPORATION, in form acceptable to PURCHASER's attorney, from the SELLER and from each director and each officer of the CORPORATION. *287 (g) A written call and waiver of notice of a special meeting of the board of directors of the CORPORATION for the limited purpose of accepting resignations, to be held at the time and place of the closing. SIXTH
6.1 Closing. The closing of the sale provided for herein shall take place at the offices of The National Bank & Trust Company of South Bend, Indiana, at 10:00 a.m. on October 10, 1974, or at such other time, date and place as shall be fixed by mutual agreement between the SELLER and PURCHASER in accordance with the terms of this Agreement. Said date or such other agreed upon time and date is herein called the "Closing Date". At the closing hereunder, there shall be delivered to the parties hereto all certificates, opinions, letters, agreements, consents, lists, books, records and other instruments and documents required or contemplated by this Agreement to be delivered on the Closing Date. At 2:00 p.m. on October 10, 1974, a special meeting of the board of directors of the corporation was held. At this meeting the board of directors was advised that petitioner had sold his 174 shares of the corporation's stock to the bank as trustee pursuant to a purchase *288 and sale agreement dated October 10, 1974. Petitioner and his wife and the other then member of the board of directors submitted their resignations as officers and directors of the corporation and Mr. French was elected president and director, Mr. C. Lamar Gemberling was elected secretary-treasurer and director, and Mr. Robert E. Cleppe was elected as a director. The new board of directors reviewed the corporate plan of dissolution adopted on October 15, 1973, and a resolution was offered and passed that the corporation proceed with the plan of liquidation previously adopted. As a result of the liquidation of the corporation, the trust, as the then sole stockholder, received the following assets: Amounts Received in Liquidation
1st. National Bank of Chicago - C.D.
$ 300,000.00
$ 65,000 U.S. Treasury Bills
64,179.75
300,000 U.S. Treasury Bills
282,955.91
First National Bank - C.D.
100,000.00
National Bank & Trust Co. - TCD
105296
200,000.00
St. Joseph Valley Bank - Checking
14,013.42
National Bank & Trust - Checking
24,717.97
State of Israel Bonds
2,000.00
Mortgage Receivable - Barron
60,000.00
Loan Receivable - Al Davidson
24,037.50
Interest Receivable - C.D.
15,644.19
Total Proceeds
$ 1,087,548.74
*289 The corporation assumed or paid at the liquidation $ 38,644.26 of corporate liabilities leaving net proceeds received by the bank as trustee of $ 1,048,904.48. On October 11, 1974, the bank as trustee paid to petitioner in accordance with the purchase and sale agreement of October 10, 1974, $ 137,500 and gave petitioner an unsecured note for $ 850,000 to be paid in the amounts and on the dates set forth in the purchase and sale agreement. The difference of $ 12,500 between the $ 150,000 cash payment provided for in the agreement and the $ 137,500 paid represents an offset against a loan receivable from petitioner to the corporation which was a part of the assets received by the trustee upon the liquidation. The adjusting journal entries to the books and records of the corporation were made as of October 14, 1974. These journal entries showed the cancellation of the loan receivable from petitioner of $ 12,500. The trust reported the $ 48,905 excess of the value of the assets it received from the corporation in liquidation and the $ 1,000,000 paid petitioner for the corporate stock on its U.S. Fiduciary Income Tax Return for the fiscal year ended September 30, 1975, as a short-term *290 capital gain. A bill of sale was issued from the corporation to the bank as trustee on October 14, 1974, in which the parties attested that the corporation had transferred and assigned all of its rights and interests to the bank directly. The secretary of state of the State of Indiana issued to the corporation a certificate of dissolution subsequent to October 14, 1974. On June 5, 1975, the Internal Revenue Service received a Form 1120 in the name of the corporation stating that it was for the taxable year beginning September 1, 1973, and ending August 31, 1974, and a Form 1120 in the name of the corporation marked "FINAL RETURN" stating that it was for the period beginning September 1, 1974, and ending October 14, 1974. Both of these Forms 1120 bore the signature of petitioner and under "Title" was written the word "President." Both of the Forms 1120 also bore the signature of Tenenbaum, Topping & Simon, C.P.A., of Hollywood, Florida. These Forms 1120 were presented to petitioner after they were prepared by a member of the C.P.A. firm and petitioner signed them without questioning the C.P.A. firm representative as to his authority to do so. Federal income tax returns for *291 the calendar year 1974 were filed on behalf of each of petitioner's sons Shane and Daniel. In addition to the U.S. Fiduciary Income Tax Return, Form 1041, filed by the trust for its fiscal year ended September 30, 1975, similar returns were filed for its fiscal years ended September 30, 1976 and 1977. On the basis of adjustments proposed by a revenue agent with respect to the fiduciary returns filed on behalf of the trust, amended fiduciary returns were filed on behalf of the trust for its fiscal years ended September 30, 1975 and 1976. Petitioner reported the sale of his stock of the corporation on his Federal income tax return for the calendar year 1974 on an installment basis. Respondent in his notice of deficiency increased petitioner's income as reported by an amount stated to be "Gain on Liquidation of Aldason Corp." In explanation of the adjustment, respondent stated that for Federal income tax purposes petitioner owned the stock of the corporation at the time of the liquidation and distribution of the assets of the corporation and that his conveyance of 174 shares of the corporate stock to the trust "constituted an anticipatory assignment of income and a sham transaction *292 and is consequently not recognized for Federal tax purposes." OPINION Section 453(b) provides for the reporting of a casual sale of personal property as an installment sale. This section permits a person making such a sale to return as income in any taxable year the proportion of the installment payments actually received in that year that the gross profit, realized or to be realized when the payment is completed, bears to the total contract price of the property. [2]
*293 Respondent on brief states that he is no longer contending that the transaction here constituted an assignment of income by petitioner. With the exception of his contention that the actual sale of petitioner's 174 shares of the corporate stock was not completed prior to the distribution of the corporate assets in liquidation, respondent now rests his case entirely on his contention that the transaction was a sham and should be given no effect for tax purposes. Respondent, in support of his argument, relies on Griffiths v. Helvering, 308 U.S. 355 (1939), and cases following the holding of that case. Respondent contends that, in this case, as in Griffiths v. Helvering, supra, the transaction lacks reality as an installment sale because, in fact, petitioner was at all times in control of the entire transaction. He further states that here, as in Higgins v. Smith, 308 U.S. 473 (1940), the sale of the stock was a sham which should not be permitted to change the time of taxation of the amount received. Petitioner takes the position that the facts here are indistinguishable from those in Rushing v. Commissioner, 52 T.C. 888 (1969), *294 affd. 441 F.2d 593 (5th Cir. 1971), and quite similar to the facts in Pityo v. Commissioner, 70 T.C. 225 (1978), Roberts v. Commissioner, 71 T.C. 311 (1978), and Goodman v. Commissioner, 74 T.C. 684 (1980). It is clear in this case that the bank was an independent trustee and an entity separate and apart from petitioner. If, as petitioner contends, he had totally disposed of his interest in the 174 shares of stock at 10:00 a.m. on October 10, 1974, prior to the distribution of assets by the corporation later that day, or on the following day, it is clear that the sale by petitioner of his stock did change his economic situation. After the sale he had no control over the corporation. Petitioner, after the sale, had only the unsecured note of the trustee to rely on for payment and not the corporate assets. The facts here are identical to those in Rushing v. Commissioner, supra, with the minor exception that the distribution of the corporate assets in liquidation in this case may have occurred only a few hours after the stock was sold instead of the next day. Certainly the fact that the stock *295 was sold at 10:00 a.m. and the resolution by the new directors of the corporation to go forward with the corporate dissolution and the distribution of the corporate assets to the stockholders was at 2:00 p.m. in the afternoon of the same day does not distinguish this case from the Rushing case. In the Rushing case the sale of the stock was on the date preceding the meeting of the new board of directors at which the resolution to go forward with the dissolution of the corporation and the distribution of its assets was adopted. We recognize that the transaction which took place in this case was planned to meet exactly the facts of the Rushing case. We also recognize and, in fact, an officer of the bank testified that it was contemplated by the trustee that the corporation would be dissolved as previously resolved. However, it is clear that under Indiana law the newly elected board of directors had the legal power to revoke the resolution of dissolution. Ind. Code sec. 23-1-7-2 (1971). Also, it is clear that after the sale of the stock the new board of directors responsible to the new independent stockholder considered the previous resolution to dissolve the corporation *296 and decided to proceed with the dissolution. This same situation prevailed in the Rushing case. It is also clear from the trust agreement that after the sale by petitioner to the trust of his stock, petitioner had no control over the actions taken by the trustee and in fact the record shows that the trustee did act independently in connection with the handling of the property of the trust as it was authorized to do under the trust agreement. We recognize that it would have been uneconomic for the trustee to have rescinded the resolution for dissolution of the corporation and distribution of its assets to its stockholders because of the Federal income tax which the corporation would have been required to pay. However, this was not a legal barrier to the rescission of the resolution of dissolution. Also, the sales agreement made provision for a reduction in the sales price of the stock by any income taxes the corporation might be required to pay. For this reason, it was not impossible for the trustee to have rescinded the resolution of dissolution. Certainly such a rescission would have been unwise since the assets of the corporation as of October 10, 1974, were in certificates *297 of deposit, checking accounts, mortgages, and loans receivable and not in operating assets. Clearly the trustee could manage the future investment of these assets as well as and probably better than the corporation. However, this same situation also prevailed in the Rushing case. In short, this case is indistinguishable from Rushing and quite similar to the cases we have cited above following the holding in Rushing. Respondent here makes a further argument that there was in reality no sale of the 174 shares of stock by petitioner to the trust at 10:00 a.m. on October 10, 1974, since petitioner did not receive the payment required to be made at closing until the following day. Respondent argues that there were no assets available to the trust to make this payment until after it received the liquidating dividend from the corporation. We have set forth in some detail in our findings the purchase and sale agreement. Clearly under this agreement the stock was sold at 10:00 a.m. on October 10, 1974. The agreement recited that the certificates were endorsed in blank and handed to the trustee at that time and the testimony in the record is to the effect that the closing *298 was held as provided for in the purchase and sale agreement although the initial payment was not made until the following day. As we read the agreement, petitioner parted with all rights to the stock when the purchase and sale was closed on October 10, 1974, in accordance with the agreement. Thereafter, the trustee owned the stock. The trustee owned the stock when the board of directors met at 2:00 p.m. on October 10, 1974. The record is not clear as to the source of the funds with which the $ 137,500 was paid to petitioner on October 11, 1974. However, a trust which owned stock in the corporation with liquid assets of over $ 1,000,000, could have obtained the funds necessary to make a $ 150,000 payment by borrowing. We conclude on the basis of the facts here present that the stock was actually sold by petitioner to the trust on October 10, 1974, prior to the meeting of the board of directors of the corporation at 2:00 p.m. on October 10, 1974. We conclude that at the time of the 2:00 p.m. meeting and at all times thereafter petitioner had no ownership rights in the corporate stock or corporate assets but that his only right consisted of his right to receive the purchase price *299 of the stock. His receipt of the purchase price was dependent on the payment on an unsecured promissory note. Under these circumstances, petitioner's economic situation was clearly changed after his sale of the stock. Here, as in some of the other cases involving similar facts, petitioner had a personal reason to enter into this transaction aside from his desire to dispose of his stock on an installment basis. By entering into this transaction, petitioner was able to set up a trust fund for his two young sons which was advantageous for them. Respondent again argues in this case as he has in a number of other cases decided by this Court that the Rushing case and the cases following it are incorrectly decided. The Rushing case was decided over 10 years ago. It was affirmed by the circuit court to which an appeal in this case would lie. This Court has consistently followed its holding in the Rushing case. Taxpayers, as did petitioner in this case, have relied in their tax planning on our holding in the Rushing case and cases following the holding in that case. Under these circumstances, we do not deem it appropriate to reconsider the holding in the Rushing *300 case at this time. This is particularly true since the statute has been amended to effectively prohibit the type of transaction in this case and the Rushing case in the future. Following our holding and that of the Fifth Circuit in Rushing, we decide the only issue presented to us for petitioner. However, because of other adjustments which have been disposed of by agreement of the parties, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Sec. 453 was amended in 1980 by Pub. L. No. 96-471, sec. 2(a), 94 Stat. 2247, affecting those dispositions of property made after May 14, 1980, to provide that when a person disposes of property to a related person as defined in sec. 318(a) under certain circumstances the amount realized with respect to the disposition of the property by the related person shall be treated as having been received by the person who disposed of the property to the related person. We are not concerned in this case with whether the facts here would fall within the provisions of the amendment since the committee reports with respect to the amendment specifically state that "The committee intends that no inference be drawn from these provisions as to the proper treatment of any related party installment sale occurring prior to the effective date provided under the bill." S. Rept. No. 1000, 96th Cong., 2d Sess (1980), 1980-2 C.B. 494↩, 503. Respondent does not argue that the amended section is applicable here or has any effect on the dispositions of this case.