888

W. B. Rushing and Mozelle Rushing, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Max Tidmore and Catherine Tidmore, Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 389–66, 390–66.   Filed August 28, 1969.

*Edward R. Smith* and *Charles B. Jones*, for the petitioners.

*H. L. Cook*, for the respondent.

OPINION

The first issue is whether W. B. and Mozelle Rushing received constructive dividends of $62,892.40 in 1962 and $2,900 in 1963. Respondent's position is that petitioners constructively received these amounts when L.C.B. advanced such amounts to Briercroft. Respondent premises his argument on the theory that the advances should be treated as contributions to capital rather than bona fide debt.

For purposes of this decision, it is unnecessary for us to decide whether the advances were bona fide debt. The test is whether the advances from L.C.B. to Briercroft were primarily to benefit Rushing. It is well established that a corporate distribution can be attributed to a particular individual if it is expended for his personal benefit or in discharge of his personal obligation. It is not necessary that the funds be distributed directly to him. *Edgar S. Idol*, 38 T.C. 444 (1962), affd. 319 F. 2d 647 (C.A. 8, 1963); *Challenge Manufacturing Co.*, 37 T.C. 650 (1962), acq. 1962-2 C.B.4.

The fact that Rushing was the sole shareholder of both L.C.B. and Briercroft is not a sufficient basis for concluding that Rushing constructively received the advances of L.C.B. Although Rushing dominated Briercroft as its single shareholder, we must recognize that Briercroft was a taxable entity separate from Rushing. *Best Lock Corporation*, 31 T.C. 1217, 1237 (1959). We have decided that whatever personal benefit, if any, Rushing received was derivative in nature. Since no direct benefit was received, we cannot properly hold he received a constructive dividend.

The record further indicates that L.C.B. as a corporation had a significant interest in Briercroft's successful development of its acreage. Briercroft's success in the development of homesites on land adjacent to L.C.B.'s shopping center would inevitably lead to increased patronage for the shopping center.

There are two lines of cases relevant to the issue under consideration. One line concerns a corporation's purchase of life insurance on the lives of its shareholders, the proceeds of which are to be used in payment for stock of a deceased shareholder. In view of a series of adverse appellate decisions, the Internal Revenue Service has conceded that the premiums paid on such insurance do not constitute constructive dividends to an insured shareholder. See Rev. Rul. 59–184, 1959–1 C.B. 65.

The second line of cases concerns whether a petitioner can be charged with a constructive dividend when another shareholder's stock is redeemed. In such cases a remaining shareholder does receive a benefit. Nonetheless, we have adopted the position that the benefit is indirect and so the redemption does not give rise to a constructive dividend. *Milton F. Priester*, 38 T.C. 316, 329 (1962).

The only other theory which could support respondent's position on this issue would be that Briercroft was a sham. There is nothing in this record to indicate that Briercroft was a sham, so we must hold for petitioners on this issue.

The next issue is whether petitioners in each docket received additional consideration of $71,000 and $8,969.09 in 1963 as a result of the sale of their K & K and P & R stock. Respondent's position is not too clear. Respondent apparently is contending that when petitioners sold their stock in K & K and P & R in 1963 they also sold certain notes evidencing loans which they had previously made to these corporations. Respondent appears to be contending that the notes were a class of equity or preferred stock. Thus, the above amounts which petitioners purportedly received as repayments of the notes were, in fact, additional consideration which petitioners received on the sale of their stock in K & K and P & R. Respondent urges that petitioners must report in full such amounts as additional gain on the sales of their shares.

Respondent's position is without merit. Even if the notes were a class of equity, their bases in the hands of petitioners would be equal to their face amount. Petitioners therefore could not have realized a gain on sale of the notes. See sec. 1.118–1, Income Tax Regs.

The third issue is whether petitioners in each docket must include in their computations under section 453 [2] of "gross profit" as well as the "total contract price" an additional $50,000 resulting from their sale of K & K and P & R stock. Respondent has not discussed this issue on brief, and we would be justified in considering it as having been conceded by him. Nonetheless, we have considered the issue.

The $50,000 was petitioners' prorata shares of a $100,000 note (note No. 2). The trustee which purchased the foregoing stock issued note No. 2 in 1963 as part of the purchase price. Before making any payments on note No. 2, however, the trustee disputed in 1963 its liability on the note.[3] The trustee claimed that petitioners misrepresented at the time of sale some of the circumstances of a shopping center owned by one of the corporations. Not until 1965 or thereafter was the dispute settled and any payment made.

Petitioners cite *North American Oil* v. *Burnet*, 286 U.S. 417 (1932), for the proposition that the computations under section 453 of "gross profit" and the "total contract price" should not include the disputed amount. We agree that the doctrine announced in the case above controls this issue. The Supreme Court held in that case that a taxpayer need not report as income an amount which was not actually received in the taxable year and might never be received. That Court added that it was immaterial whether the taxpayer filed on an accrual or cash method. In the case at bar, if petitioners' position were not adopted, the percentage of gain recognized on collections in 1963 would be increased. That result would be inconsistent with the holding of the Supreme Court in *North American Oil*.

---

[2] SEC. 453. INSTALLMENT METHOD.

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the *gross profit*, realized or to be realized when payment is completed, bears to *the total contract price*.

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

(1) GENERAL RULE.—Income from—

\* \* \* \* \* \* \*

(B) a casual sale or other casual disposition of personal property \* \* \* for a price exceeding $1,000.

may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).

[Emphasis added.]

[3] There is nothing in the record to indicate that the dispute between the parties was not bona fide.

The fourth issue is whether petitioners in each docket received from K & K dividends of $2,130 in 1962. Previously, petitioners had advanced money to K & K. The amounts in issue were allegedly paid by K & K as interest on these advances. Although Rushing and Tidmore had made the advances, four corporations in which they held stock recorded in their general lergers that they had received as interest income the amount in issue.

It is obvious that this issue raises two questions. The first is whether petitioners received the amounts in issue either directly or constructively. As to this question, petitioners have failed to satisfy the Court that they did not actually receive such amounts. Alternatively, if K & K did pay such amounts to the four corporations, petitioners have failed to prove that these payments were not made to satisfy an obligation owing by petitioners. Accordingly, we must hold that the petitioners in each docket received the $2,130 as income in 1962.

The second question is whether such amounts in the hands of petitioners were dividends or interest. The evidence supports the conclusion that petitioners' advances, pursuant to which the "interest" was paid, were in the nature of contributions of equity. Although the debt-to-equity ratio is not conclusive, we do take notice that such ratio was high in the case of K & K. The capitalization of K & K at the time of its organization was only $800. At that same time shareholders loaned the corporation $140,000. The shareholders made the loans in proportion to their respective number of shares. Obviously, unless the real estate venture of K & K succeeded, petitioners would not be repaid their loans to the corporations.

In view of the foregoing, we conclude that petitioners in each docket must characterize as dividends the amount of $2,130 which they received in 1962. Petitioners have not denied that K & K had sufficient earnings and profits to cover the dividends.

The final issue is whether petitioners in each docket are taxable on a liquidating dividend of $304,750 in 1963 resulting from their sales of stock of two corporations after the corporations had adopted plans of complete liquidation but prior to the dates of distribution.

Respondent's position is that petitioners constructively received the corporate assets in liquidating distributions and sold such assets, rather than their stock, to the trusts. The tax consequence of respondent's position would be denial to petitioners of the benefits of the installment method of reporting gain. There would be no effect on the character or total amount recognized.

Respondent relies generally on the assignment-of-income doctrine. *Lucas* v. *Earl*, 281 U.S. 111 (1930); *Helvering* v. *Horst*, 311 U.S.

112 (1940). Relating the doctrine to the instant case, respondent emphasizes that Dub-Max elected on November 15, 1962, to liquidate under section 337[4] and that T.C.C. acted similarly on December 14, 1962. Section 337 requires disposition within 12 months of all assets, less those retained to meet claims. On November 7, 1963, petitioners established trusts for their children at Citizens National Bank. Five days later the trusts purchased petitioners' stock in the two corporations. Within a day the trusts authorized the corporations to distribute their assets in liquidation. Thus, there was an affirmative act on the part of the trustee.

Respondent specifically relies on *Howard Cook*, 5 T.C. 908 (1945). In that case the shareholders commenced in October 1941 to sell their operating assets. They subsequently approved such a sale at a special meeting held on December 15, 1941. At that same meeting they voted to liquidate and dissolve the corporation prior to December 31, 1941. On December 23, 1941, petitioner addressed letters to his two minor sons advising them that he had made gifts of shares of the liquidating corporation. This Court held petitioner's intent was to make gifts to his sons of a proportion of the distributions in liquidation rather than gifts of stock. Thus, petitioner was taxable on the gain resulting from the liquidation.

The *Cook* case is clearly distinguishable from the case at bar. In *Cook* the vote for dissolution occurred prior to the gift. Moreover, petitioner's sons could not have voted to rescind the prior resolution to liquidate. Two of petitioner's associates owned a majority of the stock and they favored immediate dissolution. Petitioner also had a proxy to vote the shares of his two minor sons. In contrast, in the instant case there was a corporate trustee which was bound as a fiduciary to act on behalf of Tidmore's and Rushing's children. As the only shareholders, the trusts could have voted to rescind the resolutions of liquidation. In actual fact, they affimatively voted to carry through on the plans of liquidation.

Petitioners cite *Jacobs* v. *United States*, 280 F. Supp. 437 (S.D. Ohio 1966), affd. 390 F. 2d 877 (C.A. 6, 1968), in support of their position. It is the only reported case that has dealt with facts closely re-

---

[4] SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS.

(a) GENERAL RULE.—If—

(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

(2) within the 12-month period beginning on the date of the adoption of such plan,

all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

sembling those in the case at bar. In *Jacobs* the taxpayer gave his shares to an exempt family foundation after the corporation had elected to liquidate under section 337 and had entered into a contract of sale for its assets. The foundation received the liquidating dividends on the shares acquired from the taxpayer. The Government argued that the donation constituted an assignment of taxpayer's right to receive income and therefore he must be taxed on such income as was received by his donee pursuant to the assignment. Holding for the taxpayer, the trial court stated that notwithstanding the unlikelihood of a repudiation of the dissolution proceedings prior to their finality, such abandonment was possible.

In the instant case the facts are more favorable to petitioners than were the facts in *Jacobs*. In *Jacobs* the transferors continued to exercise control of the corporation in its position as trustee of the family foundation. In the case at bar the stock was acquired by an independent corporate trustee. There is nothing to suggest that the trustee was not free to void the resolution of liquidation, and, in fact, final implementation and fruition of the plan required an affirmative act on the part of the trustee. More significantly, in *Jacobs* the taxpayers completely escaped taxation on the liquidation. In the instant case, the only dispute has to do with the time when petitioners must report their gain on the liquidation.

*Decisions will be entered under Rule 50.*