GILBERT L. GILBERT AND FLOSSIE GILBERT, PETITIONERS
v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8774–78.     Filed April 15, 1980.

*Arnold R. Petralia,* for the petitioners.
*William J. Neild,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioners' income tax for the year 1975 in the amount of $7,483. The issue for decision is whether a transfer of $20,000 by Jetrol, Inc., to G&H Realty Corp. constituted a constructive dividend to petitioner Gilbert L. Gilbert, the common shareholder of each corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference.

Petitioners Gilbert L. Gilbert (Gilbert) and Flossie Gilbert resided in West Henrietta, N.Y., at the time they filed the petition herein. They jointly filed their 1975 income tax return with the Andover Service Center in Andover, Mass.

During the years 1974 and 1975, Gilbert was the president and sole shareholder of Jetrol, Inc. (Jetrol), a manufacturing company. He was also, during the first part of 1975, a 50-percent shareholder of G&H Realty Corp. His brother, Henry Gilbert (Henry), was the other 50-percent shareholder. G&H Realty Corp. (Realty) owned the building at 27 Lois Street, Rochester, N.Y., in which Jetrol conducted its business as a tenant. Jet Rochester, Inc., another manufacturing company, occupied the balance of the premises. Henry was the sole shareholder of Jet Rochester, Inc., until February 1975, at which time he sold all his stock to two former employees unrelated to Gilbert.

During 1975, Henry and Gilbert decided to redeem Henry's stock in Realty because Henry wanted to retire. Henry had no

legal restrictions as to whom he could sell his stock nor was there ever a contractual relationship between Gilbert and Henry obligating Gilbert to purchase the stock. The parties have stipulated that Realty did not have sufficient funds to redeem the stock.[1]

Realty attempted to borrow $20,000 from Central Trust Co. (the bank) in Rochester, N.Y., but the bank was unwilling to loan the funds to Realty. The bank might have considered refinancing the mortgage on Realty's property, but that would have involved an appraisal, a higher interest rate, and related problems which would have delayed the redemption, and Henry was in a hurry. The bank was willing to loan, and did loan, $20,000 to Jetrol on April 9, 1975, with Gilbert personally guaranteeing the loan.[2]

On April 17, 1975, Jetrol transferred[3] the same $20,000 to Realty, which forthwith used the money to redeem all of its stock owned by Henry. The check from Jetrol to Realty had the words "Loan to G. & H. Realty" typed on its face. The $20,000 was recorded on the books of account of Jetrol as a loan receivable and on the books of Realty as a loan payable. No note. or other indicia of indebtedness was executed by Realty. No rate of interest was stated on the "loan" between Jetrol and Realty to Jetrol. The $20,000 was carried on the books of account of the two corporations until Realty furnished the $20,000 to Jetrol in 1977.

Jetrol's tax return for the year ended December 31, 1974, showed the following balance sheet:

ASSETS

| | |
|---|---|
| Cash | $16,384 |
| Trade notes and accounts receivable | 34,222 |
| Inventories | 2,318 |

---

[1]The record contains no specific information as to the financial condition of Realty by way of a balance sheet, financial statement, etc.

[2]The terms of the loan, e.g., interest rate or time or times of repayment, are not revealed by the record.

[3]The stipulation states that "Jetrol *loaned* the same $20,000 to G&H Realty Corp." (Emphasis added.) It is clear that the use of the term "loan" in the stipulation is not meant to determine the legal consequences of the transfer of funds, or this case would not have been litigated by respondent. To the extent the actual facts are contrary to the stipulation, the stipulation will be disregarded. *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976).

Buildings and other fixed
depreciable assets .....................................$129,717
    Less: Accumulated depreciation .................. 58,066    $71,651

Other assets ...................................................... 7,506

    Total assets ................................................... 132,081

### LIABILITIES AND STOCKHOLDERS' EQUITY

Accounts payable ................................................. $2,932
Mortgages, notes, bonds payable in less than 1 year ..... 7,444
Other current liabilities ......................................... 22,530
Loans from stockholders ........................................ 1,243
Mortgages, notes, bonds payable in 1 year or more ....... 3,235
Common stock ................................................... 12,600
Retained earnings ............................................... 82,097

    Total liabilities and stockholders' equity ................... 132,081

Jetrol's balance sheet as of December 31, 1975, was as follows:

### ASSETS

*Current assets:*
Cash in bank ......................................... $38,052
Accounts receivable ................................. 53,547
Inventory ............................................. 5,503
Prepaid taxes ....................................... 4,500    $101,602

*Property—at cost:*
Machinery and equipment .......................... 181,579
Automotive equipment ............................. 9,343
Office equipment ..................................... 406
    Less: Accumulated depreciation    72,304    119,024

*Other assets:*
Miscellaneous receivable G&H Realty ........... 24,488
Organization costs ................................... 100    24,588
    Total assets .................................................. 245,214

### LIABILITIES AND CAPITAL

*Current liabilities:*
Accounts payable—trade ........................... $24,291
Notes payable—bank (current portion) ......... 3,892
Withheld taxes ...................................... 8,017
Accrued payroll ...................................... 2,001
Sales tax payable ................................... 140
Accrued expenses ................................... 20,963    $59,304

*Long-term liabilities:*
Notes payable:
Bank (noncurrent portion) ........................ $45,530
Officers ............................................... 470    $46,000

*Stockholders' equity:*
Common stock issued .............................. 12,600
Retained earnings ................................... 127,310    139,910
  Total liabilities and capital .................... 245,214

  Jetrol's balance sheet as of December 31, 1976, was as follows:

## ASSETS

*Current assets:*
Cash in bank ....................................... $36,909
Accounts receivable .............................. 56,096
Inventory ........................................... 3,484
Prepaid expenses ................................. 19,467    $115,956

*Property—at cost:*
Machinery and equipment ...................... 199,005
Office equipment ................................. 406
Automotive equipment .......................... 21,320
  Total ............................................. 220,731
  Less: Accumulated depreciation............. 92,393    128,338

*Other assets:*
Organization costs ............................... 288
Miscellaneous receivable G&H Realty ....... 24,489    24,777
  *Total assets* ...................................... 269,071

## LIABILITIES AND CAPITAL

*Current liabilities:*
Accounts payable—trade ........................ $22,526
Notes payable—bank ............................. 11,888
Withheld taxes ................................... 817
Accrued payroll ................................... 2,018
Accrued expenses ................................ 24,740
Accrued taxes ..................................... 19,600    $81,589

*Stockholders' equity:*
Common stock issued ........................... 12,600
Retained earnings ................................ 174,882    187,482
  Total liabilities and capital .................... 269,071

Jetrol's business was growing in 1975 and subsequently. It needed room to expand its facilities, preferably at 27 Lois Street. Jet Rochester operated in the building on annual leases with Realty, effective February 1, 1975, and February 1, 1976. In December 1976, Gilbert sent Jet Rochester a letter stating that he would not renew the lease in 1977 because Jetrol needed the space. Jet Rochester vacated the building around April 1977, at which time Jetrol began to occupy the entire building.

Later in 1977, Gilbert contracted to sell all of the capital stock of Jetrol to the Pantasote Co. (Pantasote). As part of the purchase agreement, Gilbert guaranteed payment of the obligations owed by Realty to Jetrol. Pantasote would not close the sale until the Realty "loan" was off the books. On August 12, 1977, Gilbert borrowed money from the bank and "loaned" it to Realty. Realty used the money to repay Jetrol, without interest, on August 15, 1977. Thereafter, Jetrol repaid its bank loan. Following the sale of Jetrol to Pantasote, Gilbert repaid his note at the bank.

As of December 31, 1975, Jetrol had accumulated earnings and profits of $127,310.

## OPINION

It is well established that transfers between related corporations can result in constructive dividends to their common shareholder if they were made primarily for his benefit and if he received a direct or tangible benefit therefrom. *Schwartz v. Commissioner*, 69 T.C. 877, 884 (1978); *Rapid Electric Co. v. Commissioner*, 61 T.C. 232, 239 (1973). However, if the transfer represents a bona fide loan or, even though not a loan, if the benefit to the shareholder is indirect or derivative in nature, there is no constructive dividend. *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court; *Rushing v. Commissioner*, 52 T.C. 888, 894 (1969), affd. on another issue 441 F.2d 593 (5th Cir. 1971). The issues of existence of a loan or the nature of the benefit to the shareholder are issues of fact and turn upon the circumstances of the particular case. See *Schwartz v. Commissioner, supra* at 884. The burden of proof is on the petitioners. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

Petitioners argue that the transfer at issue constituted a bona

fide loan, thereby negating respondent's determination of a dividend. The critical question in resolving this issue is whether there was a genuine intention to create a debt, which, in turn, depends upon weighing such objective factors as reasonable expectation of repayment and the economic reality of the claimed debtor-creditor relationship. *Litton Business Systems, Inc. v. Commissioner*, 61 T.C. 367, 377 (1973).[4]

Petitioners rely on Gilbert's testimony that a loan was intended. They further point to the facts that the transfer was consistently treated as a loan on the books of account and balance sheets of both corporations and that the check issued by Jetrol to Realty included a notation that it was a loan. More importantly, they contend that the subsequent repayment of the amount transferred demonstrates that it was a valid debt of Realty. Finally, they claim that since Pantasote treated the transfer as a debt (after examining Jetrol's books), so should we. Respondent replies that, since there was no note, no stated interest nor interest paid, no security given, no repayment schedule nor a fixed repayment date, it was not a bona fide debt.

We agree with respondent that, on the facts revealed by the record herein, which is woefully inadequate in many respects (see nn. 1 & 2 *supra*), no real indebtedness was created. The factors that petitioners argue establish an intent to repay are not convincing. "Such allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are in our opinion little more than additional declarations of intent, without any accompanying objective economic indicia of debt." *Alterman Foods, Inc. v. United States*, 505 F.2d 873, 879 (5th Cir. 1974). See also *Dean v. Commissioner*, 57 T.C. 32, 44 (1971). These declarations of intent must be viewed with some diffidence unless supported by objective factors demonstrating economic reality.[5]

The fact that the advance was repaid, at Pantasote's insistence, prior to the closing of the sale of Gilbert's stock in Jetrol, is also not determinative of the parties' intent at the time the initial transfer was made. The lapse of some 2½ years between

---

[4]See *Wilkof v. Commissioner*, T.C. Memo. 1978–496, on appeal (6th Cir., Feb. 26, 1979), and *Johnson v. Commissioner*, T.C. Memo. 1979–7, on appeal (6th Cir., Sept. 7, 1979), for examples of the factors which have been considered.

[5]*Wilkof v. Commissioner, supra* n. 4.

the transfer and the sale diminishes any inference which might be drawn from repayment. The repayment demand may merely have been a negotiating tactic which affected Pantasote's net purchase price by extinguishing Jetrol's very real debt to the bank. Moreover, the manner in which repayment occurred, with Gilbert effectively taking Jetrol's place by borrowing the money to enable funds to be applied for the repayment of Jetrol's debt to the bank, tends to indicate that Realty was never really expected to repay Jetrol.

It is true that, in other contexts, we have minimized the importance of some of the factors relied on by respondent. For example, it is clear that a valid debt may exist even where no formal debt instrument exists. *Joseph Lupowitz Sons, Inc. v. Commissioner, supra.* In fact, the existence of a debt instrument in this context would be of little weight without the accompaniment of other factors. *Litton Business Systems, Inc. v. Commissioner,* 61 T.C. at 378. Similarly, the absence of interest on such a debt is not determinative. *Joseph Lupowitz Sons, Inc. v. Commissioner, supra.*[6] We think the absence of interest significant in the instant case, however, because Jetrol borrowed the same money at interest and we see no business purpose for it to have subsidized Realty by "loaning" the same funds without requiring the payment of at least an equivalent rate of interest. Moreover, Realty did not have funds of its own to accomplish the redemption, and the record is devoid of any evidence of the likelihood that it would have funds available to repay at a later date funds "borrowed" for this purpose. Finally, although the other factors relied upon by respondent have not been considered significant in other cases where different fact situations existed, we are not disposed to treat them so lightly here. In short, petitioners have failed to convince us that at the time Realty received the money from Jetrol it intended to repay it. Thus, they have not carried their burden of proving the transfer gave rise to a bona fide debt.

We now turn to the question whether, since no valid indebtedness was created, Gilbert realized a constructive dividend from the transfer. It is clear that neither the finding of an indebtedness nor the mere existence of common ownership is per

---

[6]See also *Wilkof v. Commissioner, supra* n. 4.

se determinative that the common shareholder realized a dividend. See *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d at 868; *Rushing v. Commissioner*, 52 T.C. at 893–894. The test is usually the existence of a direct versus indirect benefit (see *Rapid Electric Co. v. Commissioner*, 61 T.C. at 239) which in turn usually depends upon the existence of a business purpose on the part of the corporate transferor. See and compare *Kuper v. Commissioner*, 533 F.2d 152 (5th Cir. 1976), revg. 61 T.C. 624 (1974). Petitioners' argument that it was in Jetrol's interest to consolidate ownership of its landlord in friendly hands (due to planned expansion) does not withstand scrutiny. There is no evidence that the relationship between Gilbert and his brother, Henry, was unfriendly or that Jetrol would have encountered any difficulties if Henry had remained as a 50-percent shareholder of Realty.[7] Moreover, we note that Gilbert testified that it would only have cost Jetrol $10,000 to $12,000 to move, including the costs of reinstallation. To have obligated itself for $20,000 (as it is claimed Realty did) to save such expense seems, to put it mildly, a lack of economic sense.[8] Thus, any business purpose which may have been involved is simply too tenuous to be recognized. See *Sammons v. Commissioner*, 472 F.2d 449, 452 (5th Cir. 1972), affg., revg., and remanding a Memorandum Opinion of this Court.

But the absence of business purpose is not necessarily determinative that a constructive dividend occurred. Such a purpose merely refutes, or relegates to the status of incidental or indirect, any benefit to the common shareholder of the two corporations. Obviously, the primary purpose of the transfer in question herein was to redeem Henry's Realty stock, thus making Gilbert the sole shareholder of Realty. Since the funds with which such redemption was made represented fresh funds to Realty, they clearly enhanced the value of Gilbert's Realty stock (even though they were paid out) if not offset by an

---

[7]We refuse to speculate whether Henry's former ownership of Jet Rochester would have caused him to oppose his brother's efforts to obtain more space for Jetrol.

[8]Compare *McLemore v. Commissioner*, T.C. Memo. 1973–59, affd. per curiam 494 F.2d 1350 (6th Cir. 1974).

equivalent liability, and such enhancement could be considered a constructive dividend.[9] Since we have found that no valid indebtedness from Realty to Jetrol was created, there was no such offsetting liability at the corporate level.[10]

Gilbert, however, personally guaranteed the loan of Jetrol and thus had a contingent liability to the bank. Under the circumstances of this case, we think that this potential offset should not be taken into account. According to Gilbert, the bank was unwilling to make the loan to Realty unless the mortgage was refinanced. There is nothing in the record to indicate that the possibility of an unsecured loan to Realty with a personal guaranty by Gilbert would have been acceptable. On the other hand, the bank was willing to make the loan to Jetrol, albeit with the requirement of a personal guaranty by Gilbert. Gilbert testified that Jetrol was an expanding and fast growing business, and the balance sheets of Jetrol, as well as its subsequent acquisition of additional space, confirm this evaluation. From the foregoing, we infer that the bank looked to the primary obligor (Jetrol) for repayment and that Gilbert's guaranty was in effect simply a means of protecting the bank if its expectations were not capable of being realized. The fact that Gilbert personally borrowed the funds utilized to repay the bank at the time of the Pantasote transaction, some 2½ years later, has little significance (compare our discussion on the "loan" issue, pp. 65 – 66 *supra*). The reasons for handling the repayment in the manner set forth in our findings of fact are not revealed in the record. Based upon the foregoing, we are of the opinion that Gilbert's contingent liability as a guarantor, as of February 1975, lacked sufficient substance to warrant taking it into account in determining whether Gilbert received a constructive dividend from Jetrol at that time;[11] at the very least, petitioners have not carried their burden of proving otherwise.

---

[9] See *Wilkof v. Commissioner, supra* n. 4; *Stevenhagen Co. v. Commissioner*, T.C. Memo. 1975-198, affd. per curiam 551 F.2d 106 (6th Cir. 1977). See also *Sammons v. United States*, 433 F.2d 728, 732 (5th Cir. 1970).

[10] In effect, Realty, not Jetrol as petitioners claim, was a conduit for the $20,000, with the result that, after the redemption of Henry's stock, Gilbert owned 100 percent of the same net assets of Realty as compared with the 50 percent he owned prior to the redemption.

[11] Cf. *Columbus & Greenville Railway Co. v. Commissioner*, 42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964).

The situation involving a redemption wherein liabilities of the shareholder being redeemed and on which the shareholder remains liable are assumed by the redeeming corporation is distinguishable. Under such circumstances, the shareholder was from the outset and remains the primary source of payment as far as the creditor is concerned, although, as between the shareholder and the redeeming corporation, the latter is ultimately responsible. See *Maher v. Commissioner*, 469 F.2d 225, 229 (8th Cir. 1972), revg. on this issue 55 T.C. 441, 456 (1970), and Supplemental Opinion, 56 T.C. 763, 764 (1971); Rev. Rul. 77–360, 1977–2 C.B. 86; Rev. Rul. 78–422, 1978–2 C.B. 129. See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, p. 7–32 (4th ed. 1979).

In sum, the benefits to Gilbert in 1975 were straightforward. He was able to obtain sole ownership of Realty without reducing the value of his interest in Realty's assets (see n. 11 *supra*) and without investing additional personal funds which would have been subordinated to Realty's mortgage debt. Moreover, he was able to use Jetrol's borrowing power to obtain control of Realty. See *Rapid Electric Co. v. Commissioner*, 61 T.C. at 239. Realty was unable to accomplish the redemption itself. It is Gilbert's use of Jetrol's earnings and profits for a primarily personal and noncorporate motive of Jetrol that is critical and causes such use to be a constructive dividend to him.

*Decision will be entered for the respondent.*