IRVING ALLEN and JUANITA ALLEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Allen v. Commissioner
Docket No. 1427-80.
United States Tax Court
T.C. Memo 1985-54; 1985 Tax Ct. Memo LEXIS 580; 49 T.C.M. (CCH) 677; T.C.M. (RIA) 85054; February 4, 1985
*580 Ps owned two English corporations, X, which produced motion picture films, and Y, which operated a stud farm. These corporations transferred fund to Z, a third English corporation which was owned by Ps and their children. Z operated a school to train stud farm workers. X and Y considered such transfers to be bona fide loans and expected to benefit directly from them. Ps did not directly benefit from the transfers. P maintained director's current drawing accounts with X and Y. At the end of the corporations' fiscal years ending in 1973, 1974, and 1975, amounts credited to P's account with Y were transferred to X to reduce his indebtedness to X. Held: (1) Transfers to Z from X and Y were bona fide loans and are not constructive dividends taxable to Ps. (2) Tranfers of credits from P's account with Y to X to reduce his indebtedness to X constituted income taxable to P. Joel R. Weinstein and Bert B. Rand, for the petitioners. Cruz Saavedra, for the respondent. SIMPSON
*678 MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $257,047 for 1973 and $43,822 for 1974. After concessions, the issues *581 for decision are: (1) Whether certain transfers of funds made during 1973 by two companies, both wholly owned by the petitioners, to another company, wholly owned by the petitioners and their children, are constructive dividends and taxable as such to the petitioners, and (2) whether the petitioners received taxable income as a result of one of the petitioner's companies transferring amounts credited to his director's account to another company to reduce his indebtedness to such other company. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Irving and Juanita Allen, husband and wife, were residents of Los Angeles, Calif., at the time they filed their petition in this case. They filed joint Federal income tax returns for 1973, 1974, and 1975 with the Internal Revenue Service Center, Fresno, Calif. *3 Michael, Richard, and Benita Allen are children of the petitioners. Mr. Irving Allen will sometimes be referred to as the petitioner. At the time of trial, the petitioner had been in the film business for 55 years. Since at least the 1950s, the petitioner was a director and producer of motion picture films. He was known particularly *582 as a producer of epic historical films. Many of the films produced by him utilized horses, often in large numbers. At the time of trial, the petitioner had also been involved in the horse breeding business for 40 years. Until 1976, the petitioners had resided in England for many years. In 1951, Irving Allen, Limited (IAL), was formed as an English company under The Companies Act of 1948 of the United Kingdom. IAL's principal business activity was the production, distribution, and sale of motion picture films. Some of the films made by IAL included: "The Hellions," "The Black Knight," "Genghis Khan," "Cromwell," "The Long Ships," and "The White Colt." During the years 1973 through 1975, IAL's fiscal year ended on March 31. We will refer to an IAL fiscal year by the calendar year in which such year ends. IAL had 5,000 shares outstanding; during 1973, the petitioner owned 4, 998 shares, and Juanita Allen owned 2 shares. During 1974 and 1975, the petitioner or members of his family owned all 5,000 shares of IAL. Pursuant to the Memorandum and Articles of Association of *4 IAL, the petitioner was appointed and, at all relevant times, served as a permanent director of IAL and was entitled *583 to hold lifetime office subject to the provisions of The Companies Act of 1948. During the years 1973 through 1975, the other directors of IAL were Michael Allen, Richard Allen, Clive Nicholas, Theodore Lester, and Leslie Anderson. Mr. Anderson resigned in October 1974, and Richard Allen resigned in February 1975. During the years 1973 through 1975, the petitioner was the managing director of IAL. In 1957, Derisley Wood Stud Limited (DW) was formed as an English company under The Companies Act of 1948. The principal activity of DW was stud farming. DW operated one of the largest stud farms in Europe. During the years 1973 through 1975, DW's fiscal year ended on March 31.We will refer to a DW fiscal year by the calendar year in which such year ends. DW had 100 shares outstanding; and during the years 1973 through 1975, the petitioner held 50 shares, and Juanita Allen held 50 shares. During the years 1973 through 1975, the directors of DW were the petitioner, Juanita Allen, Michael Allen, Richard Allen, Arthur Johnson, and Clive Nicholas. Mr. Nicholas resigned in May 1975. Mr. Johnson began working for DW in 1957. From 1973 until 1979, he was the stud manager of DW and was *584 in charge of all daily operations. During all relevant times, Mr. Johnson was also the managing director of DW. *5 In 1970, Newmarket School of Stud Management Limited (NS) was formed as an English company under The Companies Acts, 1948 and 1967. The principal activity of NS was the running of a school of stud management. During the years 1973 through 1975, NS's fiscal years ended on October 31. We will refer to an NS fiscal year by the calendar year in which such year ends. NS had only 5 shares of stock outstanding; during 1973, the petitioner, Juanita, Michael, Richard, and Benita Allen each held one share. During the years 1973 through 1975, the directors of NS were the petitioner, Michael Allen, Richard Allen, and Arthur Johnson. Michael Allen became a director in October 1974. During the years 1973 through 1975, Mr. Johnson was the managing director of NS. From 1973 through 1975, DW was primarily a horse breeding establishment and stud farm. It also provided premises for the school operated by NS. Thus, both DW and NS were located in Newmarket, Suffolk, England. Newmarket is a small town with a population of about 12,000 and has been the center of English horse racing *585 since the 18th century. The economic base of the Newmarket area is several large stud farms, including DW. At the time NS was formed in 1970, it was well established that there existed a need for a school to improve the training and status of stud workers within the Bloodstock Breeding Industry. Prior to and during 1973, *6 there was a constant shortage of qualified stud workers available for employment by DW. Such shortage was due in part to the limited number of stud workers available and in part to a chronic shortage of housing in the Newmarket area. It was generally accepted that a school for stud workers might have the best chance of success if established at the National Stud. However, a small group headed by the petitioner decided that initially a school should be set up elsewhere in order to demonstrate the value and viability of such a school to stud owners and others in the industry. Early in 1970, the petitioner agreed to allow a school to be organized at Derisley Wood stud. He not only offered to provide practical training at Derisley WoodStud for a number of students, but he also provided and equipped accommodations for a library and lecture room and guaranteed to *586 underwrite the school financially for the first year. It was generally believed that a school for stud workers should attempt to produce uniform methods of training and achieve standards of proficiency which would open the way to promotion from the lowest to the highest positions in the industry and establish reasonable differentials in salary and responsibility. It was also generally believed that a school for stud workers would contribute importantly to the stature of DW and the town of Newmarket and would benefit the National Stud as well as other stud *7 farms. The formation of NS was a prestigious event, and it was hoped that prominent horse interests would make financial contributions to the school because of its noteworthy goals. The petitioner was very enthusiastic about the school, and during its first year of operation, he underwrote the cost of the school. When NS was formed, it was hoped that tuition would be nominal and that scholarships would be provided. In 1973, NS provided training and instruction for stud workers at all levels in the business of horse breeding, instruction in all types of horsemanship and equestrian events, as well as instruction in owning and operating *587 stud farms and investing in real property. NS student instruction was coordinated with DW, and DW provided teaching facilities to NS and provided practical training for NS students. NS students were also employed part-time by DW to assist it in maintaining and operating its stud farm. In addition to DW, four other stud farms accepted NS students for practical training. Students worked normal hours alongside stud personnel in addition to attending lectures and demonstrations. A bimonthly system of rotation ensured that students received experience under different managements. In its first year of operation, NS graduated 16 students. The September 1974 course had 20 students. Courses taught during the first year included: husbandry of stallions, mares, foals, and yearlings; *8 foaling, feeding, and preparation for sales; pasture and general management; care of feet; and basic principles involved in recognition of signs of health and disease. NS was widely promoted and received numerous applications for admission from around that world. When NS was formed, it was difficult for its students to find housing in Newmarket. Furthermore, it was not possible for NS to rent properties in *588 the Newmarket area because the owners were not interested in renting. Most of NS's students were interested in going to work in the United States, and some of the biggest stud farms in Kentucky were interested in NS and in having NS students come to work for them after graduation. Since most of the students were British nationals, immigration problems made it difficult for NS students to go to the United States to work. However, most of them eventually were able to go to the United States. The petitioner assisted in placing NS students upon their graduation, and most of NS's students eventually became managers of stud farms. No NS student entered into a contract to work for IAL after graduation. In order for NS to be self supporting, it was believed that it would have to receive grants and donations, as well as realistic school fees, while providing scholarships for those who lacked financial sponsors. The growth of NS depended in part on the number of Newmarket area stud farms which would accept students on their farms for training. *9 During 1973, NS experienced acute financial problems caused by the failure of the British Racing Levy Board to provide anticipated funds for support *589 of the school any by the limited amount of income which could be produced from tuition fees. NS was never financially successful and continually needed funds. Prior to and during 1973, IAL was involved in the planning of several ongoing projects with NS, wherein NS was to act as a consultant regarding the training and handling of horses needed in films to be produced by IAL. Prior to the formation of NS, IAL had experienced difficulty in finding qualified personnel to train and work with the horses required for its films. During 1973, IAL was in the pre-production phase of various film projects. One project, entitled "Clive of India," was to be shot on location in India and would require the use of a large number of horses. Another project was a western film, entitled "Enge the Loner," and the production budget for such film included $40,000 to be paid to NS as consultants and advisors regarding horses. A documentary film, "A Story of a Racehorse," was produced by IAL and filmed on the grounds of DW during 1973. It showed the staff and students of NS going through their curriculum. In 1973, the petitioner had a heart attack while in France. *10 IAL, DW, and NS each maintained its *590 own books and records, prepared its own statements of account, and filed its own English tax returns. During all relevant times, Theodore Lester personally maintained the books and records of IAL, DW, and NS. The books and records of the three companies were audited regularly by the independent chartered accounting firm of Nyman Libson, Paul & Co. (NLP), London, England. During the years 1973 through 1975, NLP prepared and issued statements of account for IAL, DW, and NS. IAL and DW were authorized by their charters to loan funds to other companies, and NS was authorized by its charter to borrow funds from other companies. According to the books and records of IAL and NS, IAL transferred the following amounts to NS during 1973: Date
Amount
January 4, 1973
[1] 3,000 pounds
May 30, 1973
12,000 pounds
June 19, 1973
50,000 pounds
August 9, 1973
65,000 pounds
130,000 pounds
The 3,000 pounds transferred by IAL to NS on January 4, 1973, was recorded as a loan in the books and records of NS, but such amount was not recorded in the books and records of IAL. *11 According to the books and records of DW and NS, DW transferred the following amounts to NS during *591 1973: Date
Amount
January 4, 1973
1,000 pounds
February 8, 1973
9,500 pounds
March 21, 1973
3,000 pounds
July 18, 1973
39,000 pounds
October 25 or 26, 1973
10,000 pounds
62,500 pounds
The transfers of 1,000, 9,500, and 3,000 pounds were recorded as loans in the books and records of NS but were not recorded in the books and records of DW. All transfers from IAL and DW to NS were authorized by the directors of each company. The directors of the companies intended the transfers to be short-term loans which would enable NS to purchase properties to provide housing for its students. The directors also intended that NS would pay the market rate of interest on the loans, 6-1/2 percent. With the exception of the transfer of 3,000 pounds by IAL and the transfers of 1,000, 9,500, and 3,000 pounds by DW, the transfers from IAL and DW to NS during 1973 were recorded on the books and records of IAL, DW, and NS as loans and were reflected in the audited financial statements of the companies prepared by NLP. In the years prior to and after 1973, IAL and DW transferred various amounts to NS. *12 None of the statements of account for IAL, DW, or NS for years subsequent to 1972 reflect either the accrual of interest *592 payable or receivable with respect to the amounts carried on their books and records as loans from IAL and DW to NS made during 1973. The statements of account prepared by NLP for IAL for the years 1973, 1974, 1975, and 1976 do contain accrual accounts relating to rents receivable and administration charges receivable which are treated as income of IAL. During 1972 through 1975, NS incurred, and recorded in its statements of accounts, bank charges and interest charges. Under English statutory law, an interest charge attaching to loans should be shown either on the balance sheets or the profit and loss account of an English company. The transfers made by IAL and DW to NS in 1973 were demand loans, and all such transfers were made without restrictions concerning the use of funds by NS. No promissory note existed with respect to the transfers made by IAL and DW to NS, and no fixed maturity date existed with respect to the transfers. No fixed schedule for repayment existed or was followed with respect to the transfers, and no collateral or security interest was taken to secure repayment. Bank loans which appeared on NS's balance sheets were secured. *13 NS expected to repay the transfers *593 made to it by IAL and DW from fee income, loan refinancing, contributions from various British agencies, rental income, or through the eventual sale of the properties that it had purchased. Subsequently, financial problems prevented NS from completely repaying the transfers outstanding to IAL and DW. No legal action was taken to collect the amounts not repaid. During the period from 1972 through 1974, NS purchased a number of real properties in or about Newmarket. NS paid a total of 350,108 pounds for 9 parcels of real property. Of this amount, 165,000 pounds was borrowed from a bank. The remaining amount was obtained from IAL and DW. Some of the properties purchased by NS contained business establishments, and after it purchased the properties, NS continued to rent parts of the properties to such business establishments. At the time of the purchase of the properties, it was anticipated that both rents and the sale prices of real estate in the Newmarket area would rise. NS received the following amounts as student fees, donations, and rental income: Rental
Year
Student Fees
Donations
Income
1972
2,850 pounds
500 pounds
414 pounds
1973
1,650 pounds
805 pounds
5,772 pounds
1974
4,188 pounds
0
6,329 pounds
1975
1,832 pounds
0
1,844 pounds
*14 *594 In addition, two properties were sold in 1974 for 62,023 pounds, a surplus of 27,318 pounds over the purchase price of the two properties. IAL produced motion picture films and earned revenues from the sale and distribution of films, as well as its profit participation in such films. In the books and records of IAL, revenue from the production and distribution of films was reported as turnover. IAL received the following amounts of turnover, and it earned the following net profits or losses from its film activities: Year
Turnover
Net Profit (Loss)
1969
170,324 pounds
(308,440) pounds
1970
108,666 pounds
80,180 pounds
1971
3,387,813 pounds
(288,973) pounds
1972
185,849 pounds
174,977 pounds
1973
145,552 pounds
136,962 pounds
1974
292,760 pounds
268,117 pounds
1975
280,157 pounds
130,216 pounds
1976
57,075 pounds
54,122 pounds
During the years 1969 through 1976, IAL never formally declared or formally paid a dividend. From its operations, DW realized the following profits and losses: Year
Profit (Loss)
1970
37,212  pounds
1971
(842) pounds
1973
(47,071) pounds
1974
(135,972) pounds
1975
(186,353) pounds
1976
(13,865) pounds
*15 During the years 1971 through 1976, DW never formally declared or formally paid a dividend. During *595 the period from April 1, 1973 to March 31, 1974, DW realized a "surplus" on the sale of a partnership investment in real estate in the amount of 607,307 pounds. "Surplus" is defined by its chartered accountants as "revenue net of expenses." From its operations, NS realized the following losses: Year
(Loss)
1972
(2,024) pounds
1973
(8,030) pounds
1974
(8,765) pounds
1975
(14,103) pounds
The Internal Revenue Service commenced its audit of the petitioner's books and records in April 1976. The petitioners' attorney was provided with a copy of the IRS's proposed audit report in January 1978. Michael Allen had statements of loan account prepared in 1978 and furnished to the IRS as a result of questions by the agents concerning the transfers from IAL and DW to NS. Such statements were also prepared for the companies' own information. The statements of loan account showed that DW transferred 120,331.39 pounds to NS during the years 1970 through 1978, that interest in the amount of 18,861.92 pounds was charged, and that all but 48,739.59 pounds was repaid. The statements of loan account also show that IAL transferred 130,000.00 pounds to NS during the years 1973 through 1978, *16 that interest in the *596 amount of 40,760.03 pounds was charged, and that only 1,000.00 pounds was repaid. The statements of loan account show that 6-1/2 percent interest was accrued on the transfers. The petitioner spent approximately 6 months of each year traveling for business purposes. Both his business and personal expenses were paid out of his director's current drawing accounts while he was away. During the years 1973 through 1975, the petitioner maintained director's current drawing accounts with both IAL and DW. Such accounts were established and authorized by IAL and DW to provide funds to directors as requested. Funds could be withdrawn for any purpose on the condition that the accounts would be closed out at the end of each fiscal year. Directors were fully accountable to the companies for all amounts charged against their current accounts. A director's current drawing account reflects amounts due to a company by a director (debit balance) or amounts due to a director by a company (credit balance). Often the director's current drawing account of the petitioner had credit balances, indicating that the companies owed him money. The director's current drawing account of the petitioner with IAL *597 and DW reflected the following debit (credit) balances: *17 Year
Debit (Credit) Balance
IAL
DW
1973
59,055 pounds
(10,670) pounds
1974
58,779 pounds
(2,032) pounds
1975
58,751 pounds
6,698 pounds
The petitioner's IAL account debit balance of 59,055 pounds for 1973 was arrived at after a credit adjusting entry of 6,000 pounds in favor of the petitioner and a corresponding debit entry to his DW account. His IAL account debit balance of 58,779 pounds for 1974 was arrived at after a credit adjusting entry of 11,500 pounds in favor of the petitioner and a corresponding adjusting debit entry to his DW account. His IAL account debit balance of 58,751 pounds for 1975 was arrived at after a credit adjusting entry of 8,422 pounds from DW in favor of the petitioner. In his notice of deficiency, the Commissioner determined that the petitioners received advances during the year 1973 from IAL and DW as a result of the transfers of funds from such companies to NS. He treated the advances as constructive dividends taxable to the petitioners. With respect to the transfers from DW to NS, the Commissioner determined that only the transfers of 39,000 and 10,000 pounds were advances. He also determined that the amounts *598 transferred from the petitioner's director's current drawing account with DW to his account with IAL in 1973, 1974, and 1975 were constructive dividends to the petitioners. *18 OPINION The first issue for decision is whether certain transfers of funds during 1973 by IAL and DW to NS are constructive dividends and taxable as such to the petitioners. It is well established that transfers between related corporations can result in constructive dividends to their common shareholder if they were made primarily for his benefit and if he received a direct or tangible benefit therefrom. Gilbert v. Commissioner,74 T.C. 60, 64 (1980); Schwartz v. Commissioner,69 T.C. 877, 884 (1978); Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973). If the transfer represents a bona fide loan or, even though not a loan, if the benefit to the shareholder is indirect or derivative in nature, there is no constructive dividend. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court; Gilbert v. Commissioner,supra;Rushing v. Commissioner,52 T.C. 888, 894 (1969), affd. on another issue 441 F.2d 593 (5th Cir. 1971). The mere *599 existence of common ownership is not per se determinative that the shareholder realized a dividend. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d at 868; Gilbert v. Commissioner,supra at 66-67; Rushing v. Commissioner,52 T.C. at 893-894. However, a corporate distribution can be attributed to a *19 particular individual if it is expended for his personal benefit or in discharge of his personal obligation; it is not necessary that the funds be distributed directly to him. Rushing v. Commissioner,52 T.C. at 893; Idol v. Commissioner,38 T.C. 444, 457-458 (1962), affd. 319 F.2d 647 (8th Cir. 1963); Challenge Manufacturing Co. v. Commissioner,37 T.C. 650, 662-663 (1962). The issues of the existence of a loan and the nature of the benefit to the shareholder are issues of fact and turn upon the circumstances of the particular case. Gilbert v. Commissioner,supra; see Schwartz v. Commissioner,supra at 884. Ordinarily, the petitioner has the burden of disproving the Commissioner's determination. Rule 142(a), Tax Court Rules of Practice and Procedure[2]; Welch v. Helvering,290 U.S. 111 (1933). In the present case, the petitioners, prior to trial, filed a motion under Rule 142 for *600 a declaration by the Court that the Commissioner would bear the burden of proof with respect to the first issue for decision. The motion was based on the argument that the Commissioner, according to the petitioners, took a position at trial with respect to the constructive dividend issue that constitutes new matter under Rule 142 since the Commissioner's theory at trial was different from the theory contained in his notice of deficiency. Prior to the *20 commencement of the trial, we heard oral argument on the petitioners' motion. At that time, we decided not to rule on the motion, and we took it under advisement. Upon careful consideration, we have determined that we need not rule on the motion since the record in the present case fully supports our determination of the first issue for decision regardless of which party bears the burden of proof. The initial question in resolving this issue is whether there was a genuine intention to create a debt, which, in turn, depends upon weighing such objective factors as reasonable expectation of repayment and the economic reality of the claimed debtor-creditor relationship. *601 Gilbert v. Commissioner,74 T.C. at 65; Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 376-377 (1973). The petitioners argue that the transfers from IAL and DW to NS constitute bona fide loans, thereby negating the Commissioner's determination of a dividend. They point to the fact that the transfers in question were authorized by the directors of the respective companies, that it was the directors' intention that the transfers constituted bona fide loans, and that 6-1/2 percent interest was to be paid on the loans. They also argue that the transfers were made for valid corporate purposes. The petitioners emphasize that the transfers were recorded on the books and records of the various companies as loans. The Commissioner, on the *21 other hand, stresses the fact that no interest charges were recorded on the books and records of the various companies, while at the same time interest charges incurred in connection with secured bank loans were recorded as such on the books and records of NS. In his argument, he also emphasizes the fact that no promissory note or other formal indicia of indebtedness existed. In determining whether certain transactions constitute bona fide *602 loans, the intent of the parties is important. Donisi v. Commissioner,405 F.2d 481, 483 (6th Cir. 1968), affg. per curiam a Memorandum Opinion of this Court; Byerlite Corp. v. Williams,286 F.2d 285, 290-294 (6th Cir. 1960). In addition, the books and records of companies involved in intercorporate transfers are some evidence of whether such transfers constitute loans. However, "allegedly objective economic indicia of debt such as consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any accompanying objective economic indicia of debt." Alterman Foods, Inc. v. United States,505 F.2d 873, 879 (5th Cir. 1974); see also Dean v. Commissioner,57 T.C. 32, 44 (1971). Such declarations of intent must be viewed with some diffidence unless supported by objective factors demonstrating economic reality. Gilbert v. Commissioner,74 T.C. at 65. It is clear that a valid debt may exist even where no formal debt instrument *22 exists. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d at 867-868; Gilbert v. Commissioner,74 T.C. at 66. Formal documentation is not controlling. Litton Business Systems, Inc. v. Commissioner,61 T.C. at 376-377. *603 The absence of interest on a debt or the fact that the debt was subsequently repaid is also not determinative. Joseph Lupowitz Sons, Inc. v. Commissioner,supra;Gilbert v. Commissioner,supra.
In the present case, we have been convinced, and we have found, that the transfers by IAL and DW in 1973 to NS were intended to be loans. The transfers were recorded as loans on the books and records of the three companies. The evidence shows that the directors of the companies intended the transfers from IAL and DW to NS to be short-term loans which would help NS provide much needed housing in Newmarket for its students. The directors, who testified at trial or whose depositions are part of the record, all maintained that valid debts were intended to be created between the various companies and that the loans were to be repaid with 6-1/2 percent interest. During 1973, it was expected, or at least it was hoped, that NS would be able to attract donations and that such donations along with tuition and fees would enable NS to be self-supporting. Finally, the directors believed that since the transfers were to be used to purchase properties in Newmarket and since it was expected that such *604 properties would appreciate in value, the *23 loans made by IAL and DW were thought to be relatively secure. Thus, at the time the transfers were made, repayment was in fact contemplated by the companies, and such expectation was reasonable. See Tollefsen v. Commissioner,52 T.C. 671, 678-680 (1969), affd. 431 F.2d 511 (2d Cir. 1970). The Commissioner argues that the fact that most of IAL's transfers and some of DW's transfers were not repaid by NS and the fact that NS was never in very good financial condition should convince us that bona fide loans were not intended by the parties in 1973. However, the fact is that most of the loans by DW and some of the loans by IAL have been repaid, and the fact of such repayment is persuasive evidence that the transfers were intended to be loans. [3]Byerlite Corp. v. Williams,286 F.2d at 291. Moreover, it is clear that we must look to the intent of the parties and the bona fides of the loans when the transfers were made in 1973. As one court has observed, the fact that "the tangible assets of the corporation were not such, at any given time during the taxable period, as to repay any part *24 of the loan--was not a controlling consideration requiring *605 a conclusion that the advances were not loans." Byerlite Corp. v. Williams,286 F.2d at 290-291. It is true that formal notes were not executed to evidence the loans, but the lack of such formalities is not controlling. Litton Business Systems, Inc. v. Commissioner,supra. In many cases, the courts have found that transfers of funds represented loans even though there were no formal notes to evidence such loans. See, e.g., Joseph Lupowitz Sons, Inc. v. Commissioner,supra;Rapid Electric Co. v. Commissioner,61 T.C. at 236-240. In addition, as the petitioners' expert witness on English law testified, a valid corporate debt can be created between two English corporations when the obligation is entered on the books and records of the corporations, even though there are no formal notes reflecting the obligation. Thus, we consider the lack of written *606 notes to have no significance. The failure to accrue interest on the loans by IAL and DW to NS, although interest was accrued on bank loans, does have some significance. However, other evidence--the testimony of the various directors and others involved with the companies--overwhelmingly supports the conclusion that IAL, DW, and NS intended to create bona fide debt in making the 1973 transfers of funds between the companies. The failure to accrue interest was apparently merely an *25 oversight, and that fact alone does not overcome the weight of the other evidence. Our conclusion is reinforced when we consider the question of whether the petitioners received any direct benefit as a result of the transfers. See Schwartz v. Commissioner,supra;Rapid Electric Co. v. Commissioner,61 T.C. at 239; Rushing v. Commissioner,52 T.C. at 893-894. The Commissioner argues that the petitioners received a direct benefit as a result of the transfers from IAL and DW to NS since the value of their ownership interest in NS increased when capital was diverted from profitable companies to an unprofitable company at their direction. He contends that the transfers enabled the petitioners to make real *607 estate investments without using personal funds. He also contends that the benefits conferred on IAL and DW as a result of their transfer of funds to NS were incidental and indirect. IAL expected to benefit as a result of the loans it made to NS since IAL had traditionally produced films that required the use of large numbers of horses. It was expected that NS would provide IAL with a pool of personnel who would be able to work with and help train the horses needed for various film projects. In the past, IAL had experienced difficulty in finding adequate trained personnel to train and work with the required horses. The film, "A Story of a Racehorse," a documentary produced by IAL which *26 utilized the students and staff of NS, is an example of how NS benefitted IAL. During 1973, it was anticipated that NS would be involved in the projects "Clive of India" and "Edge the Loner." DW benefitted as a result of its transfer of funds to NS since NS's students were available to work for DW on a part-time basis thereby alleviating the constant shortage of personnel needed to care for DW's horses. In addition, DW expected to benefit in that NS's anticipated success would reflect favorably on *608 DW thereby enhancing DW's stature and reputation. On balance, we are satisfied that IAL and DW did benefit from the transfers to NS. The benefits to IAL and DW may not have been sufficient to explain contributions to the capital of NS, but IAL and DW did not contribute capital--they merely made short-term loans which they expected to be repaid. IAL did not ultimately benefit to the extent that it expected in 1973. However, at the time the loans were made, there was a real and a reasonable expectation on the part of both IAL and DW that they would directly benefit from NS's operations. The failure to realize the expected benefit may have been due to the heart attack of the petitioner, which caused a significant change in the operations of IAL. Finally, it is abundantly clear that the petitioners, themselves, did not directly benefit from IAL and DW's *27 transfers to NS. Cf. Sparks Nugget, Inc. v. Commissioner,458 F.2d 631 (9th Cir. 1972), affg. a Memorandum Opinion of this Court. The Commissioner's argument that the transfers allowed the petitioners to make real estate investments that they would not otherwise have been able to make is not convincing. The properties purchased *609 by NS were purchased in order to provide housing for its students. It was expected that such properties would appreciate in value, but we do not believe that the record establishes that they were purchased with a principal purpose of investment. Any benefit received by the petitioners was insubstantial and indirect. For the foregoing reasons, we hold that the 1973 transfers from IAL and DW to NS were bona fide loans and do not constitute constructive dividends to the petitioners. The second issue for decision is whether the petitioner received income as a result of the transfer of credits from his director's current drawing account with DW to his account with IAL. The burden of proof on this issue is on the petitioners. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). The petitioners argue that these year-end adjustments do not constitute constructive dividends to them. They contend that the petitioner remained in the exact same financial position after the adjustments as before. At the end of each year, one company owed him money, while he owed *28 money to the other company. They argue that the adjustments were mere accounting adjustments between the companies and did not *610 constitute a distribution since no funds were ever transferred to or for the benefit of the petitioners. They contend that the adjustments were in effect a "wash." [4]
On this issue, we find the petitioners' arguments to be without merit. It is undisputed that the director's current drawing accounts were used to pay both personal and business expenses of the petitioner, but the petitioners have made no attempt to distinguish between business and personal expenses paid out of such accounts. Nor has the Commissioner attempted to distinguish between those payments which were made for business purposes and those made for personal purposes; the Commissioner's theory is that at the end of each year, the petitioner owed IAL certain amounts and that he realized income *611 as a result of his obligation to IAL being reduced by reason of the transfer of the credits which he had with DW. The record is not altogether clear as to the source of the credits which the petitioner had with DW, but the evidence suggests that those credits resulted from the remuneration due to the petitioner. If, in fact, *29 such credits did reflect DW's obligation to pay compensation to the petitioner, then the transfer of such credits to IAL was in effect a payment of such compensation; the petitioner benefitted by the payment of his compensation to IAL since his indebtedness to that corporation was reduced by such amount. In any event, the petitioners have failed to show that the arrangement did not constitute constructive dividends or other forms of income taxable to the petitioner. Accordingly, we hold that the petitioners are taxable on the amounts of the credits transferred by DW to IAL. Decision will be entered under Rule 155.
Footnotes
1. All references to pounds are to British pounds.↩
2. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
3. Of course, if IAL and DW ultimately forgive the debts arising from their advances to NS, such forgiveness may constitute income from discharge of indebtedness. See sec. 61(a)(12); Commissioner v. Jacobson,336 U.S. 28 (1949); United States v. Kirby Lumber Co.,284 U.S. 1 (1931); OKC Corp. and Subsidiaries v. Commissioner,82 T.C. 638↩ (1984).
4. Alternatively, the petitioners argue that the year-end adjustments should be considered as short-term interest-free loans and as such not taxable to them. However, there is no factual basis in the record before us to support the petitioners' contention. Accordingly, they have not shown that the year-end adjustments should be considered as short-term interest-free loans. Rule 142(a); Welch v. Helvering,290 U.S. 111↩ (1933).