ROBERT E. DAVIS AND REBECCA DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; AREDCO, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket Nos. 24808-93, 24824-93
United States Tax Court
T.C. Memo 1995-283; 1995 Tax Ct. Memo LEXIS 280; 69 T.C.M. (CCH) 3004; June 22, 1995, Filed *280 Decisions will be entered under Rule 155. Held: D received dividends of $ 200,451 from certain intercorporate transfers of money. Held, further, D's sec. 1244, I.R.C. loss was $ 12,500. For petitioners: Peter C. Guild and Max K. Boyer. For respondent: Katherine Holmes Ankeny. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: The subject cases were consolidated for trial, briefing, and opinion. Robert E. Davis (Davis) and Rebecca Davis (Mrs. Davis) petitioned the Court to redetermine respondent's determination of a $ 62,466 deficiency in their 1990 Federal income tax. Aredco, Inc. (Aredco) petitioned the Court to redetermine respondent's determination of a $ 70,982 deficiency in its Federal income tax for its taxable year ended October 31, 1990 (its 1989 taxable year). Following concessions, [1] we must decide: 1. Whether Davis received constructive dividends of $ 200,451 from certain intercorporate transfers of money. We hold he did. *281 2. Whether Davis had a section 1244 loss of $ 12,500 or $ 25,000. We hold it was $ 12,500. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. We collectively refer to Davis and Mrs. Davis as the Davises. We collectively refer to the Davises and Aredco as petitioners. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. The Davises are husband and wife. They resided in Arizona when they petitioned the Court. They filed a 1990 Form 1040, U.S. Individual Income Tax Return, using the status of "Married filing joint return". Davis is Aredco's president and its sole shareholder. Aredco's principal place of business was in Arizona when it petitioned the Court. Aredco operated a wholesale specialty medical distributorship at all times relevant herein. For its 1989 taxable year, Aredco reported its operation on Form 1120, U.S. Corporation Income Tax Return. Aredco's gross receipts and taxable income for that year were $ 3,363,435 and *282 $ 15,958, respectively. Aredco's retained earnings at the end of that year were $ 510,266. Aredco's retained earnings on October 31, 1989, were $ 478,746. Davis desired to form a fabric retail business in 1988. He initially consulted with Arlene Schaffner (Schaffner). Schaffner had recently left a job at Calico Corners, a national fabric retailer, where she was first employed as a salesperson and then as a manager. Although Schaffner helped Davis formulate a plan to start a fabric store, Davis never effectuated this plan because he later learned that a corporation (Seller Corp.) was selling the assets of its fabric store. Davis formed the Davis Acquisition Corp. on November 30, 1988, to buy these assets, and Davis subscribed to purchase all 100,000 shares of Davis Acquisition Corp.'s stock for $ 100,000. [2] On the same day, Davis Acquisition Corp., which changed its name to Oscar Leverant Fabrics Corp. on or about December 1, 1988, [3] paid Seller Corp. $ 100,000 for its fabric store's assets (hereinafter, we use the term "Oscar Leverant" to refer interchangeably to Davis Acquisition Corp. and Oscar Leverant Fabrics Corp.). Of this $ 100,000, $ 75,000 was paid for the store's *283 assets and $ 25,000 was paid for the promise of Robert W. Dyess (Dyess), both individually and on behalf of Seller Corp., not to compete with Oscar Leverant for 1 year within the State of Arizona. Dyess was the president and principal shareholder of Seller Corp. Oscar Leverant paid Seller Corp. the $ 100,000 by delivering $ 50,000 in cash to it and issuing it a $ 50,000 promissory note (Promissory Note). The Promissory Note provided that Oscar Leverant would begin on January 1, 1989, to pay Seller Corp. monthly installments of $ 1,660.72 toward principal and interest (at 12 percent per annum), *284 and all principal and interest was due on or before November 30, 1991. Payment of the Promissory Note was secured by Davis' personal guarantee and was collateralized by the transferred assets (and proceeds from any sale thereof). Oscar Leverant adopted a fiscal year ending on November 30, and opened for business in December 1988. Oscar Leverant employed Schaffner as its manager. [4] Davis was Oscar Leverant's president, treasurer, and chairman of the board. Davis was greatly involved in Oscar Leverant's financial operation and oversaw its management. Davis signed the checks payable to Seller Corp. with respect to the Promissory Note, signed most of the checks payable to Oscar Leverant's landlord, and signed Oscar Leverant's payroll checks. Davis was the trustor and trustee of a grantor trust, the Robert E. Davis Family Trust (Davis Trust), which was formed in *285 1983. The Davis Trust advanced Oscar Leverant $ 50,000 in November 1988 and $ 35,000 over a 3-month period ending in June 1989. [5] Originally, these advances were unsecured and were neither repayable with interest nor evidenced by a note. Subsequently, in October 1989, Oscar Leverant delivered to the Davis Trust an $ 85,000 promissory note (Note 1), that bore interest at 10 percent, was payable on demand, and was secured by the assets of Oscar Leverant. Oscar Leverant never made any payments on Note 1, and Oscar Leverant never accrued or paid any interest due to the Davis Trust with respect thereto. On December 9, 1988, Oscar Leverant borrowed $ 100,000 from M&I Thunderbird Bank (Bank) for additional operating funds. The Bank had initially refused to loan the money to Oscar Leverant based on the value of its assets, and the Bank made the loan to Oscar Leverant only after receiving Davis" personal guarantee. *286 [6] On or about June 7, 1989, the Bank extended the loan for 90 days. [7] This extension was arranged by Davis. On September 6, 1989, the Bank extended the $ 97,913.08 loan for another 180 days. This extension was also arranged by Davis. The 180-day extension was guaranteed by the Davis Trust, Schaffner, and Schaffner's then husband (Mr. Schaffner). [8] The guarantee of Schaffner and Mr. Schaffner (collectively referred to as the Schaffners) played no part in the Bank's decision to extend the loan for another 180 days. The Bank required the personal guarantee of all principal shareholders of a debtor corporation, regardless of the shareholders' resources, and Davis had notified the Bank before the second extension that Schaffner had been given a 50-percent interest in Oscar Leverant. *287 Oscar Leverant's initial year of operation generated a loss of $ 225,720. As of December 31, 1989, Oscar Leverant's 13-month loss was $ 253,856.71, and its shareholder's equity was a negative $ 227,603. [9] Oscar Leverant lost another $ 250,481 in its second year of operation. Oscar Leverant's 2-year loss was $ 476,201. In October 1989, Davis caused Oscar Leverant to issue 12,500 shares to the Schaffners in exchange for $ 12,500, and 12,500 shares to the Davises in exchange for $ 12,500. Contemporaneously therewith, the Davis Trust loaned the Davises and the Schaffners $ 12,500 each, in order for them to pay for their transferred stock, [10] and Schaffner was promoted to manager, vice-president, and secretary. Schaffner's promotion and ownership of stock were meant to serve as an incentive *288 to her in managing Oscar Leverant. [11]
Davis advanced Oscar Leverant $ 9,000 in December 1989. On January 11, 1990, Aredco transferred $ 200,000 to Oscar Leverant. [12] Aredco had borrowed the $ 200,000 (with interest at prime plus 2 percent) from the Bank on January 10, 1990, and the Davis Trust had guaranteed the loan's repayment. Before Aredco arranged its $ 200,000 transfer to Oscar Leverant, Oscar Leverant had attempted to borrow money directly from the Bank. The Bank refused to loan Oscar Leverant any money. Oscar Leverant used the $ 200,000 as follows: $ 99,137 paid off the Bank's *289 loan to Oscar Leverant; [13] $ 91,863 satisfied numerous delinquent obligations of Oscar Leverant; and $ 9,000 paid off Davis' advance. Aredco's $ 200,000 transfer to Oscar Leverant was accompanied by a promissory note (Note 2) that provided that Oscar Leverant: (1) Would begin paying Aredco monthly interest (at an annual rate of prime plus 4 percent) in February 1990 and (2) would not have to pay any principal until July 11, 1992. Note 2 also provided: (1) Its payment was secured by Oscar Leverant's assets, [14] and (2) Aredco could declare the principal and interest due and payable immediately, without notice, if Oscar Leverant failed to pay timely principal or interest. *290 On September 5, 1990, Dyess notified Davis that the Promissory Note was in default, and that Seller Corp. was demanding the balance of principal and interest immediately due and payable. On September 20, 1990, Davis was notified by Oscar Leverant's lessor that Oscar Leverant owed rent for June 1990 through September 1990. Prior to June 1990, Oscar Leverant had made the $ 12,204.24 monthly rent payments. On October 19, 1990, Davis (individually and as president of Oscar Leverant) and Schaffner (individually and as vice-president of Oscar Leverant) agreed that: (1) Schaffner's employment with Oscar Leverant was terminated immediately; (2) Schaffner was resigning as an officer and director of Oscar Leverant; (3) Schaffner would transfer and convey the Schaffners' Oscar Leverant stock to Oscar Leverant; (4) Schaffner was relinquishing all of her other rights, title, and interest in Oscar Leverant and its stock; (5) Oscar Leverant would pay Schaffner $ 2,500 for her past managerial services; and (6) Davis was terminating Schaffner's obligations to the Davis Trust under the $ 12,500 promissory note. On October 23, 1990, Aredco declared that Oscar Leverant was in default of the $ 200,000 *291 "loan" and took possession of Oscar Leverant's assets. No interest payments were ever made on Note 2, and Aredco never tried to collect interest on the note although Oscar Leverant had sufficient funds in its checking account to have made the required monthly interest payments through June 1990. Aredco transferred to Oscar Leverant another $ 50,451.33 in October 1990; $ 30,451.33 was transferred before October 23, 1990 and $ 20,000 thereafter. On October 24, 1990, Davis directed Oscar Leverant to wind down its business. On November 23, 1990, Oscar Leverant sold substantially all of its assets to Aredco for a credit bid of $ 50,000. Aredco agreed to pay the Davis Trust $ 50,000 on Note 1 and to pay Seller Corp. the $ 21,912.03 remaining due on the Promissory Note. At the time of trial, Davis Trust had received only $ 19,500 of Aredco's $ 50,000 obligation. On its 1989 Form 1120, Aredco claimed a bad debt deduction of $ 224,251. Respondent determined that Aredco could deduct only $ 23,800 of this amount because the balance was not a bad debt arising from a true debtor-creditor relationship based upon a valid and legally enforceable obligation. On their 1990 Form 1040, the Davises *292 reported a $ 25,000 ordinary loss under section 1244 with respect to their Oscar Leverant stock. The Davises reported that Oscar Leverant had sold them 25,000 shares of its stock on December 1, 1988, for $ 25,000 and that the stock had become worthless in 1990. Respondent determined that the Davises received $ 200,451 in dividends from Aredco during their 1990 taxable year (i.e., the $ 200,000 transfer, plus the $ 50,451 transfers in October 1990, minus Aredco's $ 50,000 credit bid). Respondent determined that the dividends arose from corporate distributions from Aredco that came out of its accumulated earnings and profits. OPINION Petitioners bear the burden of proving that respondent's determinations set forth in her notices of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Respondent bears the burden of proving the increase in the Davises' deficiency asserted in her amended answer. Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990). As explained below, this increase in deficiency pertains to the second issue. Issue 1. Constructive Dividend
A *293 shareholder may receive a dividend from a corporation, even if it does not distribute cash or property directly to the shareholder. A dividend is constructively received by a shareholder who owns stock in two corporations when an intercorporate transfer is treated as a distribution to the shareholder from the transferring corporation. The effect of this constructive dividend theory is that the transferred funds are first considered distributed from the transferor corporation to the common shareholder, and the shareholder is then considered to have contributed the funds to the transferee corporation's capital. Sammons v. Commissioner, 472 F.2d 449, 453 (5th Cir. 1972), affg. in part, revg. in part, and remanding T.C. Memo. 1971-145. An intercorporate transfer of funds does not automatically result in a constructive dividend to a common shareholder. Joseph Lupowitz Sons, Inc. v. Commissioner, 497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue T.C. Memo. 1972-238; Sammons v. Commissioner, supra at 451. We apply a two-prong test *294 to determine whether an intercorporate transfer results in a constructive dividend. Under the first prong, an objective test, we must ascertain whether the shareholder exercised control over the transferred funds. Under the second prong, a subjective test, we must ascertain whether the primary purpose of the transfer was to benefit the common shareholder. Stinnett's Pontiac Serv., Inc. v. Commissioner, 730 F.2d 634, 640-641 (11th Cir. 1984), affg. T.C. Memo. 1982-314; Sammons v. Commissioner, supra at 452; Gulf Oil Corp. v. Commissioner, 89 T.C. 1010, 1029 (1987), affd. on this issue 914 F.2d 396 (3d Cir. 1990). a. Shareholder Control Over the Transferred Funds
A distribution to a shareholder from a corporation's earnings and profits is an essential element of a dividend. Sec. 301(a), (c)(1). In order to receive a distribution from a corporation, the shareholder must receive something of value from it. Because the common shareholder does not directly receive funds or property in an intercorporate transfer, such a transfer *295 is a distribution to the shareholder only if: (1) The transferred funds leave the control of the transferring corporation, and (2) the shareholder controls the funds, directly or indirectly, through some means other than the transferor corporation. The divestment of corporate control is critical in determining whether an intercorporate transfer is a distribution to the shareholder. Sammons v. Commissioner, supra at 453-454. Key to the determination of divestment of corporate control is whether the transferred funds create bona fide debt or equity. Transfers that create bona fide debt usually negate the claim of a constructive dividend. Whether a transfer creates bona fide debt or equity is a question of fact. Bauer v. Commissioner, 748 F.2d 1365, 1367 (9th Cir. 1984); A.R. Lantz Co. v. United States, 424 F.2d 1330, 1334 (9th Cir. 1970); Gilbert v. Commissioner, 74 T.C. 60, 64 (1980). In passing on this factual determination, courts have considered many factors. These factors, which are not equally significant and none of which by itself is controlling, *296 include: (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a fixed maturity date; (3) the source of payments; (4) the right to enforce the payment of principal and interest; (5) participation in management as a result of the advances; (6) a status of the advances equal or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) the identity of interest between creditor and stockholder; (9) a thin or adequate capitalization; (10) the ability of the corporation to obtain loans from outside sources; (11) the uses to which the advances were put; (12) the failure of the debtor to repay; (13) the risk involved in making the advance; and (14) the payment of interest only out of "dividend" money. Hardman v. United States, 827 F.2d 1409, 1411-1412 (9th Cir. 1987); Bauer v. Commissioner, supra at 1368; A.R. Lantz Co. v. United States, supra at 1333; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980). These factors help separate shareholders who transfer money to corporations *297 in exchange for equity interests that are repayable based on the corporations' performance, from creditors who transfer money to corporations in return for obligations that are payable regardless of the corporations' performance. Bauer v. Commissioner, supra at 1367; A.R. Lantz Co. v. United States, supra at 1334. The above-mentioned factors focus primarily on ascertaining the intent of the parties through their objective and subjective expressions. Bauer v. Commissioner, supra at 1367; A.R. Lantz Co. v. United States, supra at 1333-1334; Litton Business Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973). In passing on this intent, we ask ourselves: (1) Did the parties truly intend to create a debt; (2) was their intention consistent with the economic reality of creating a debtor-creditor relationship; (3) did the transferor reasonably expect to be repaid; and (4) would an unrelated lender have advanced money to the transferee in the same amount and on the same terms. Litton Business Sys., Inc. v. Commissioner, supra at 377. *298 Based on our review of the entire record, and evaluation of all of the factors mentioned above, we answer these four questions in the negative with respect to the subject transfers. The record points squarely to the conclusion that the transfers represented equity contributed to Oscar Leverant by Davis to pay its debts. Given Oscar Leverant's financial position, including its minimal equity capital, we do not believe that Aredco's claimed loans to Oscar Leverant comport with the arm's-length standards and normal business practices of bona fide debtors and creditors. See Estate of Mixon v. United States, 464 F.2d 394, 403 (5th Cir. 1972). To the contrary, the economic reality of Aredco's alleged loans to Oscar Leverant is that the underlying funds constituted risk capital that was subject to the fortune of Oscar Leverant's business. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968). The uses to which the funds were placed supports the fact that the transfer was meant solely as a quick infusion of capital to pay the bills of Oscar Leverant's creditors. Petitioners argue in their brief that *299 Aredco made the subject transfers to Oscar Leverant intending to earn high interest on the debt. According to petitioners, Aredco considered Oscar Leverant to be a sound investment and wanted Aredco to earn a higher rate of interest than it was earning on its bank accounts. We are unpersuaded by this argument. Among other things, the record does not support petitioners' claim that Davis was making a sound investment for Aredco. To the contrary, the record indicates that Oscar Leverant presented a risky and speculative investment. Its capitalization was thin, it had incurred a heavy loss in its first year, it continued to incur losses in its second year, and it needed money quickly to prevent its imminent failure. As a point of fact, Oscar Leverant did not invest the subject funds in its business' growth, but used the funds to satisfy its creditors. Payments on the transfers were also not guaranteed by sufficient collateral, were subject to the risk of Oscar Leverant's business, were not projected to be paid out of expendable assets or soundly anticipated cash-flow, and depended entirely on Oscar Leverant's business taking a 180-degree turn and generating profits. Contrary to *300 petitioners' assertion, the fact that Davis was not given a greater management role in Oscar Leverant in return for the transfers is insignificant; Davis already effectively controlled the finances and management of Oscar Leverant. Given the additional fact that Oscar Leverant had a negative equity on December 31, 1989, we are also unpersuaded that an unrelated lender would have loaned money to Oscar Leverant. Indeed, the Bank had recently refused to approve such a loan. We also find relevant the fact that no interest or principal payments were made in due course on the $ 200,000 transfer. Interest was payable monthly, and Oscar Leverant generally had enough liquid funds to make these payments. Although Aredco notified Oscar Leverant that its interest payments on the transfer were past due, Aredco took no action to collect these delinquent payments until October of 1990, when Aredco declared the $ 200,000 to be in default and took possession of Oscar Leverant's assets. Aredco's security interest in those assets was subordinate to that of Oscar Leverant's other creditors. Yet Aredco proceeded to advance $ 50,451 more to Oscar Leverant, apparently without taking back a note or *301 security, in the same month as Aredco declared the $ 200,000 to be in default. Though the $ 200,000 transfer had several of the formal indicia that commonly surround debt, e.g., a promissory note bearing an interest rate and a fixed maturity date, we are not persuaded, in light of all the facts and circumstances, that any of these advances was a bona fide debt. Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493-497 (1980). Petitioners also contend that the $ 200,000 transfer was a true loan because at the time of the transfer the Davises owned only a 50-percent interest in Oscar Leverant, with the Shaffners owning the other 50 percent, and Davis would not have made an unmatched contribution to Oscar Leverant's capital. We do not find this argument to be convincing. The Shaffners never paid for their stock in the corporation and surrendered it within a year after they acquired it. It was Davis who controlled and had the greatest stake in the company, and had the most to lose from Oscar Leverant's failure. In sum, we find that the transfers from Aredco to Oscar Leverant were not bona fide debt but were contributions to capital. In light of the *302 control exercised over both corporations by Davis, the common shareholder, we conclude that the first prong of the two-prong test for a constructive dividend is satisfied. [15]
b. Whether Transfer Made Primarily for Shareholder Benefit
We next consider whether Aredco's primary purpose for transferring the moneys to Oscar Leverant was to benefit Davis, and whether Davis received a direct or tangible benefit therefrom. Rapid Elec. Co. v. Commissioner, 61 T.C. 232, 239 (1973); Rushing v. Commissioner, 52 T.C. 888, 893-894 (1969), affd. 441 F.2d 593 (5th Cir. 1971). We look to the business purpose for the transfers to determine whether Aredco had a justifiable business purpose. A justifiable business purpose may not exist when the intercorporate transfer is made *303 to satisfy the transferee corporation's debt that was personally guaranteed by the common shareholder. In such a case, the primary benefit may be bestowed on the guaranteeing shareholder, especially if the debtor corporation would have otherwise defaulted on the debt. Wortham Mach. Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975); Schwartz v. Commissioner, 69 T.C. 877, 884-885 (1978); Cox v. Commissioner, 56 T.C. 1270, 1280 (1971). We find that Aredco had no business purpose for advancing money to Oscar Leverant. Oscar Leverant was not a profitable concern. Its business was unrelated to the business of Aredco, and Aredco had never made a similar transfer to an unrelated business. Petitioners contend that a business purpose is found in the fact that Aredco was making a good investment by advancing $ 200,000 to Oscar Leverant. We are unpersuaded. We find incredible petitioners' proposition that an unrelated, reasonable investor would have advanced money to Oscar Leverant at an expected return of only 2 percent. [16] Such a minimal rate of return is hardly enough to justify the *304 considerable risk that is undertaken by investing in an insolvent company such as Oscar Leverant. We next consider whether Davis enjoyed the primary benefit from the transfer. Notwithstanding the lack of a corporate business purpose, a taxpayer may avoid constructive dividend treatment if the transfer did not benefit him or her. Laure v. Commissioner, 70 T.C. 1087, 1108 (1978), revd. on other grounds 653 F.2d 253 (6th Cir. 1981); Cox v. Commissioner, supra at 1280. In discussing this inquiry, the parties focus on four of the factors listed in Wilkof v. Commissioner, T.C. Memo. 1978-496, affd. per curiam 636 F.2d 1139 (6th Cir. 1981). *305 We will do likewise. The four factors discussed by the parties are: (1) Was the common shareholder able to use the transferor as a source of risk capital for the transferee without using his or her personal resources; (2) could the common shareholder carry on a business with extremely thin capitalization without having his or her personal funds subordinated to the transferee's substantial indebtedness; (3) was the value of the common shareholder's equity interest in the transferee enhanced by the transfer; and (4) was the common shareholder relieved of potential liability on his or her personal guarantees of loans made to the transferee, which were partially paid off with the funds transferred by the transferor. Based on our evaluation of these four factors, we conclude that they all indicate that Aredco made the subject transfers to Oscar Leverant for the primary benefit of Davis, and that he primarily benefited therefrom. We find relevant the facts that the Bank had refused to loan Oscar Leverant any more money, Aredco was a profitable company with excess earnings and profits, and the subject transfers eliminated the need for Davis to risk any more of his funds (or those of *306 his grantor trust) in Oscar Leverant's business. We also find relevant the facts that Oscar Leverant was in poor financial condition, Aredco's repayment depended primarily upon the future performance of Oscar Leverant, and Aredco's transfers allowed Davis to continue Oscar Leverant's business with extremely thin capitalization and without having to infuse additional personal resources that would be subordinated to Oscar Leverant's substantial indebtedness. In addition, Davis' equity interest would increase if Oscar Leverant became profitable, Oscar Leverant's survival hinged on an infusion of capital to pay its debts, Davis was relieved of potential liability on Oscar Leverant's debts to the Bank and Seller Corp., and Davis used some of the transferred money to settle his $ 9,000 advance. This prong of the test for a constructive dividend is also satisfied. c. Conclusion
We conclude that Aredco's transfers to Oscar Leverant were constructive dividends. Aredco is considered to have distributed $ 250,451 to Davis as a dividend, and Davis is considered to have contributed $ 250,451 to the capital of Oscar Leverant. [17]
*307 Issue 2. Section 1244 Loss
On their 1990 tax return, the Davises reported a $ 25,000 loss with respect to 25,000 shares of Oscar Leverant stock. Respondent asserted in her amended answer that the Davises were only allowed a $ 12,500 loss on their Oscar Leverant stock. Respondent primarily contends that the 12,500 shares of the Schaffners are outside of section 1244 because the Davises did not receive the shares directly from Oscar Leverant. Section 165(g)(1) and (2)(A) generally provides that a taxpayer realizes a capital loss when stock that is a capital asset becomes worthless. Section 1244 provides a limited exception to this general rule in that it allows an individual to treat as an ordinary loss a loss on "section 1244 stock" that would otherwise be a capital loss. Sec. 1244(a); Morgan v. Commissioner, 46 T.C. 878, 889 (1966). The term "section 1244 stock" generally means stock of a qualifying domestic corporation that was issued for money or other property (other than stock or securities). Sec. 1244(c). Section 1.1244(a)-1(b), Income Tax Regs., provides that a taxpayer claiming the benefits of section 1244 must have continuously *308 held the relevant stock from the date of its issuance and may not have acquired it from another shareholder by purchase, gift, devise, or in any other manner. Adams v. Commissioner, 74 T.C. 4, 8 (1980). Only the 12,500 shares originally issued to Davis qualify for ordinary loss treatment under section 1244. Id.; sec. 1.1244(a)-1(b), Income Tax Regs. The Davises did not own any more shares of Oscar Leverant stock continuously from their time of issuance. [18] See also sec. 1.1244(c)-1(b), Income Tax Regs. (increase in basis of outstanding stock from contribution to capital not treated as issuance of stock under section 1244). In this regard, we consider the 100,000 shares of stock that were originally issued to Davis to have been redeemed by Oscar Leverant for no consideration at the time that Oscar Leverant issued the 25,000 shares to the Schaffners and the Davises. *309 We have considered all arguments made by the parties and, to the extent not discussed above, find them to be without merit. To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Respondent conceded Aredco's $ 4,226 inventory adjustment. Aredco conceded a $ 19,169 net operating loss carryover.↩
2. Contemporaneously therewith, Davis received a stock certificate for these 100,000 shares. Although Davis was supposed to transfer $ 100,000 in cash to Davis Acquisition Corp. before it issued the certificate to him, the record does not indicate that he ever did so.↩
3. Seller Corp. had operated the store under the name "Oscar Leverant", and Davis believed that using Oscar Leverant's name would maximize the store's sales.↩
4. Although Schaffner was an employee of Oscar Leverant, she sometimes worked for less (or none of the) compensation for which she was otherwise entitled.↩
5. The $ 50,000 advance was the cash payment that Oscar Leverant had delivered to Seller Corp. for its assets.↩
6. Davis was a valued customer of the Bank, and he had substantial deposits there.↩
7. The extension applied to principal of $ 97,913.08. The record does not explain the $ 2,086.92 difference between the extended principal and the initial principal of $ 100,000.↩
8. Mr. Schaffner had been a salesman at Aredco since 1985.↩
9. As of this date, Oscar Leverant had assets of $ 202,857.73 (its assets were mainly fabrics, leasehold improvements, equipment, and fixtures); current liabilities of $ 204,360.15; and long-term liabilities of $ 226,100.58.↩
10. The Schaffners signed a promissory note that stated that the $ 12,500 was payable to the Davis Trust (without interest) on or before December 31, 1991. The promissory note was collateralized with the Schaffners' stock.↩
11. The record does not indicate (and the parties have not explained) why the Schaffners' shares were issued to both of them. We assume that this was done pursuant to the community property laws of Arizona.↩
12. Davis did not guarantee any repayment of this transfer.↩
13. By Jan. 1990, Oscar Leverant had made all of the monthly interest payments due to the Bank with respect to this loan.↩
14. Aredco filed this security interest in May 1990, approximately 4 months after the transfer. Aredco's "advance" to Oscar Leverant was subordinate to Oscar Leverant's other debt (including Note 1).↩
15. We note that petitioners have never challenged respondent's determination that Aredco's earnings and profits support classifying the distributions as dividends.↩
16. Petitioners contend in their brief that Aredco's return on the $ 200,000 transfer would have been prime plus 4 percent. Petitioners, however, have ignored the fact that Aredco borrowed the $ 200,000 from the Bank at prime plus 2 percent.↩
17. Davis realized a capital loss with respect to these transfers when the stock of Oscar Leverant became worthless. Sec. 165(g)(1) and (2)(A). Contrary to petitioners' assertion in their brief, the loss is not eligible for ordinary loss treatment under sec. 1244. Sec. 1.1244(c)-1(b), Income Tax Regs.↩
18. Davis also did not have a $ 12,500 bad debt loss on the loan with respect to the Schaffners' shares because he received full consideration on his "forgiveness" of their debt.↩